# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 76518-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| DAVID LEVICE PHILLIPS, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: December 17, 2018 |
| | ) | |

MANN, A.C.J. — David Phillips appeals his conviction for assault with domestic violence aggravators. Phillips contends that the trial court (1) violated his right to an impartial jury by failing to sua sponte excuse a juror, (2) abused its discretion under ER 801(d)(1)(i) when it admitted a victim statement as evidence, and (3) erred in entering a no-contact order between Phillips, the victim (Phillips's wife), and his stepdaughter.

In a supplemental assignment of error, Phillips seeks remand to the trial court to strike the imposition of a $100 fee for collection of DNA (deoxyribonucleic acid) pursuant to our Supreme Court's recent decision in State v. Ramirez, 191 Wn.2d 732, 426 P.3d 714 (2018). The State concedes that remand to strike the DNA collection fee is appropriate. We accept the State's concession. We otherwise affirm Phillips's conviction and sentence.

I.

On July 1, 2016, Phillips came home late after his wife Sara Phillips was in bed asleep with their infant daughter. After Sara told Phillips to leave her alone, an argument ensued that then became physical. Sara's daughter, Joe'll Talbert, and Sara and Phillips's infant daughter were in the house. At some point, Sara gave the phone to Talbert, telling her to call the police if the fight continues or if Phillips hits Sara. Talbert called 911 and reported that Phillips was hitting Sara. When Phillips saw that Talbert was calling the police, he knocked the phone from her hands.

King County Sheriff's deputies responded to the 911 call and found the house in chaos and Sara in the living room crying. Sheriff Deputy Daniel Spiewak interviewed Sara and asked her to describe the altercation and prepared a written victim statement based on what Sara described. In her statement, Sara told Spiewak that Phillips tried to take her baby from her, punched her in the chin, choked her until she felt she would pass out, kicked her, and then tried to throw her down the stairs. Sara signed the victim statement "under penalty of perjury." Sara also told the responding paramedic that Phillips choked her, and that she had neck pain.

Phillips was arrested and booked into jail on July 1, 2016. From jail, Phillips repeatedly called Sara demanding that she get him out and expressing his anger at the police having been called. During these calls Sara made several references to Phillips choking her, at one point stating that he was in jail because he "sat there and fuckin' choked the fuck outta me." The State charged Phillips with assault in the second degree, domestic violence. The State alleged two aggravators. First, that the assault occurred within sight or sound of the victim's or the offender's minor child under the

authority of RCW 9.94A.535(3)(h)(ii), and second, that the assault was part of an ongoing pattern of psychological, physical, or sexual abuse under the authority of RCW 9.94A.535(3)(h)(i). The State also charged Phillips with tampering with a witness.

A jury found Phillips guilty of second degree assault and found the State proved both aggravating circumstances. The jury was unable to reach a verdict on the tampering charge, and it was dismissed. Phillips had an offender score above nine due to multiple previous domestic violence offenses. Based on Phillips's high offender score, and the jury's findings of two aggravating circumstances, the trial court imposed the statutory maximum sentence of 120 months. The court also imposed a no-contact order with respect to both Sara and Talbert for the duration of his sentence of 120 months.

Phillips appeals.

## II.

Phillips first contends that the trial court violated his Sixth and Fourteenth Amendment right to an impartial jury when it failed to, sua sponte, strike juror 10 for bias. We disagree.

## A.

During voir dire, the trial court asked if any of the jurors had personal experience with domestic violence. Juror 10 was among the venire members who raised their hand. When asked to elaborate, he explained that his sister and his wife's sister-in-law were both involved in abusive relationships with intimate partners. The State then asked,

The question for you, as a juror, is whether you cannot ignore your past experiences but remain open-minded and hold the State—that is, hold me to my burden of proof, that I have to prove this case to you beyond a reasonable doubt. Can you [h]old me to that burden and keep an open mind until you've heard from all of the witnesses?

Juror 10 responded that the issue "weighed" on him heavily, and stated, "I consider myself to be fair and objective by nature, but this is a deeply emotional issue and I don't know." The State responded, "Why don't you think about this as we're kind of talking with everyone, and you'll let us know if you're feeling like this is not the right case for you. Does that work?" Juror 10 then elaborated, "What's unknown for me is what will come up in the course of the story and how will that affect me." The trial court asked if juror 10 had another issue that he wanted to talk about privately, and stated they would discuss those issues later.

The State and the defense questioned several other jurors about their ability to hold the State to its burden. In the process, seven jurors were dismissed for cause because they expressed an inability to be fair. When juror 10 was given the opportunity to speak privately in the courtroom, he revealed an experience in college after an intermural basketball game when an African American player on the opposing team assaulted him. Juror 10 explained, "nothing came of it, but it left an emotional imprint." He further elaborated,

And this is an emotional truth. I don't live this way; I don't believe this; but I'm also aware that feelings happen in reality that black men are more prone to violence.

It was also notable that afterwards when, you know, the gym supervisor was called and there was just a huddle on the spot, and then, of course there was denial and, you know, dismissiveness of it.

And that's another narrative; that those who are violent try to get out of it; so those are two personal emotions imprints that are there, as well.

Phillips is an African American male.

Juror 10 expounded further on what he called "emotional truths" relating to his family members dealing with domestic violence, his concern that "domestic violence is underreported and underrecognized" in society, and his belief that "domestic violence that isn't prosecuted or isn't punished leads to worse tragedy and grief." Finally, juror 10 stated,

On the other hand, I trained as a scientist and I hold it as a personal principle to be fair and objective, and I do believe that I could hear and see what happens in this trial fairly and objectively. What I don't know is what the life of those emotional truths will have when push comes to shove, so I feel I owe it to the alleged and to this Court for you all to know that.

In response, the trial court informed juror 10 that the attorneys had some follow-up questions. The State relayed that nobody is suggesting any of the jurors would believe "domestic violence is fine," the question is whether he is "going to hold the State to its burden." The State further offered, "if at some point you feel like, 'Look, this just isn't something that I think I can hold the State to its burden and not be fair,' just let us know."

Defense counsel then asked about juror 10's statements regarding his "emotional pull to think that maybe African-American men are more likely to be violent or more likely to try to get out of it if they are . . ." Juror 10 clarified that it was "those who perpetrate violence" that are more likely to try to get out of it. Defense counsel asked,

Q. Do you think that in this case where we have a[n] African-American man who is being charged with a crime of violence, that that feeling is

something that's going to tip the scale, even if it's just a grain of sand; that that kind of underpinning that it sounds like this comes back from your college years, so we're talking about years of battling with that. Is that something that you think might tip the scale?

A. I don't think so.

Defense counsel then asked if, like another juror, juror 10 believed being aware of his history made it easier to consciously deal with any bias or prejudice. Juror 10 agreed.

Defense counsel moved on to ask a few follow-up questions about his history with domestic violence. Defense counsel asked if juror 10 believed he "could look at this case in isolation" and not as a societal problem. Juror 10 explained that it is "very difficult for the evidence and the truth of domestic violence to be revealed." However, he also stated, "I understand and ascribe to the principal that it must be the merits of this situation and the evidence and the stories that are presented here that need to establish what the reality is in this particular case." Defense counsel also asked if juror 10 would want a juror like him deciding his case. Juror 10 said yes because of his "ability and intent to be objective and fair," but that his history is a consideration. Finally, defense counsel asked,

Q. Are you comfortable taking an oath and saying that, "I'm here and I'm going to abide by the law, and I'm going to look at this case in the way that the judge instructs me and I'm going to go look at the evidence in this case," and swearing to that up front and holding yourself to it at the end?

A. Absolutely.

Q. Okay.

A. If it's in your judgment that I'm worthy and appropriate, I will absolutely do my best.

Neither party asked for juror 10 to be excused for cause. Following the remainder of individual voir dire, the State accepted the panel without exercising any peremptory challenges. Phillips used all but one peremptory challenge to strike several jurors. With one peremptory challenge left, Phillips accepted the panel. Juror 10 was seated.

## B.

The Sixth and Fourteenth Amendments of the United States Constitution, and article I, section 22, of the Washington Constitution, guarantee a criminal defendant the right to trial by an impartial jury. State v. Davis, 175 Wn.2d 287, 312, 290 P.3d 43 (2012).[1] To ensure this constitutional right, the trial court will excuse a juror for cause if the juror's views "'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" State v. Gonzales, 111 Wn. App. 276, 277-78, 45 P.3d 205 (2002) (quoting State v. Hughes, 106 Wn.2d 176, 181, 721 P.2d 902 (1986)). "The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of prejudice." State v. Irby, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015), review denied, 184 Wn.2d 1036 (2016).

At trial, either party may challenge a prospective juror for cause. RCW 4.44.130. Actual bias is a ground for challenging a juror for cause. RCW 4.44.170(2). Actual bias occurs when there is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged

---

[1] While neither party contests this issue, seating a biased juror is a manifest error affecting a constitutional right, and may be raised for the first time on appeal. State v. Irby, 187 Wn. App. 183, 192, 347 P.3d 1103 (2015), review denied, 184 Wn.2d 1036 (2016).

person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2); see also RCW 4.44.130.

The trial judge has an independent obligation to excuse a juror, regardless of inaction by counsel or the defendant. Irby, 187 Wn. App. at 193 (citing Davis, 175 Wn.2d at 316). Under RCW 2.36.110,

> It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

And, under CrR 6.4(c)(1), "If the judge after examination of any juror is of the opinion that grounds for challenge are present, he or she shall excuse that juror from the trial of the case."

We accord the trial court broad discretion in considering "all the circumstances" and determining whether to excuse a juror for cause. Irby, 187 Wn. App. at 193. A trial court need not excuse a juror with preconceived ideas if the juror can set those ideas aside and decide the case on the evidence presented at the trial and the law as provided by the court. RCW 4.44.190; State v. Rupe, 108 Wn.2d 734, 748, 743 P.2d 210 (1987). Rather, to excuse a juror based on actual bias the trial court "must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190. "'The trial judge is in the best position to evaluate whether a particular potential juror is able to be fair and impartial based on observation of mannerisms, demeanor, and the like.'" Irby, 187 Wn. App. at 194 (quoting Gonzales, 111 Wn. App. at 278.)

C.

Phillips argues juror 10's statements relating to his "emotional imprints" and "emotional truths" about African American men being more violent, that violent people try to avoid punishment, and that domestic violence is underreported displayed actual bias, requiring that he be dismissed. See Irby, 187 Wn. App. at 196. Phillips relies primarily on Irby, arguing there is more evidence of actual bias in this case than in Irby, accordingly we should reverse.

In Irby, the defendant had elected to proceed pro se, and waived his right to be present during jury selection. During voir dire, two jurors expressed reservations about their ability to be fair. In response to a general question about whether anyone had a particularly good or bad experience with the police, juror 27 described herself as "pro police officer." Irby, 187 Wn. App. at 191. Upon further questioning by the State, juror 27 explained that her father was a retired county sheriff, and that "she was predisposed to believe police officers because of family relationships and work experience." Irby, 187 Wn. App. at 196. The State then asked whether she would be able to put her own personal connections aside and try the case on the evidence. Juror 27 responded, "I think it will be hard for me just because he isn't represented at all. So I'm kind of pro police officer." Juror 27 summarized that "Yes, it causes me concern. I will try, but it does cause me some concern." Irby, 187 Wn. App. at 191. There was no follow-up exchange, and juror 27 was not heard from again during voir dire.

Juror 38 also expressed concerns with potential bias, explaining first that "I'm a little concerned because I did work for the government, Child Protective Services, I'm more inclined towards the prosecution I guess." In response, the court asked, "would

that impact your ability to be a fair and impartial juror? Do you think you could listen to both sides, listen to the whole story so to speak?" To which, juror 38 replied, "I would like to say he's guilty." There was no follow-up to this statement. Irby, 187 Wn. App. at 190. Jurors 27 and 38 were seated on the jury.

On review, we considered in what circumstances the trial court must, sua sponte, intercede and strike a juror for actual bias. In reaching our conclusion, we considered the Sixth Circuit's decision in Hughes v. United States, 258 F.3d 453 (6th Cir. 2001), and our decision in Gonzales, 111 Wn. App. 276. In Hughes, one of the jurors volunteered that she had "'quite close'" connections to police officers. When the trial court asked her if anything in those connections would prevent her from being fair, she responded "'I don't think I could be fair.'" The trial court asked her again, "'You don't think you could be fair?'" The juror responded "'No.'" Irby, 187 Wn. App. at 194 (quoting Hughes, 258 F.3d at 456). There was no subsequent follow-up and the juror was seated. The Hughes court, while recognizing that appellate courts should be circumspect to the trial court when it comes to determining actual juror bias, nonetheless found the juror's clear declaration that she did not think she could be a fair juror compelling evidence of actual bias. Hughes, 258 F.3d at 458-59.

Irby summarized our decision in Gonzales as follows:

In Gonzales, a juror candidly admitted she would have a "'very difficult'" time disbelieving a police officer and was not certain she could apply the presumption of innocence. We recognized this statement as a clear indicator of bias that was never neutralized by further questioning. "At no time did Juror 11 express confidence in her ability to deliberate fairly or to follow the judge's instructions regarding the presumption of innocence." We held that the juror demonstrated actual bias, and the trial court abused its discretion by denying a challenge for cause.

Irby, 187 Wn. App. at 195-96 (internal citations omitted).

Based on this analysis, in Irby, we found the trial court did not err in striking juror 27, holding that, "the record does not clearly demonstrate actual bias on the part of juror 27." Irby, 187 Wn. App. at 196. Although juror 27 stated a predisposition to believe police officers, she also responded that she would "try" to set aside those predispositions. We determined it "was within the court's discretion to view juror 27's answers as an adequate assurance of impartiality." Irby, 187 Wn. App. at 196. See also State v. Lawler, 194 Wn. App. 275, 283, 287, 374 P.3d 278, review denied, 186 Wn.2d 1020 (2016).[2]

In contrast, however, we concluded that juror 38 demonstrated actual bias. As we explained,

> The same cannot be said about juror 38. In response to a question designed to gauge her ability to judge Irby fairly, her answer was she "would like to say he's guilty." This is like the Hughes juror's unqualified statement that she did not think she could be fair. And like in *Hughes,* there was a "conspicuous lack of response." Hughes, 258 F.3d at 458. Neither the trial court nor the prosecutor attempted to elicit from juror 38, individually, an assurance that she had an open mind on the issue of guilt.
>
> At the end of voir dire, the prosecutor reiterated the State's burden of proof and questioned the group generally: "'Does everybody here think that they can basically make a finding of guilty or not guilty based on the evidence that you hear?" The State contends juror 38's impartiality can be inferred from the fact that she, like the rest of the potential jurors, made no response to this question. But such questions directed to the group cannot substitute for individual questioning of a juror who has expressed actual bias.

---

[2] In Lawler, Division Two of this court held that a juror's statements responding to questions concerning partiality "I don't see how I could be objective with all that past experience" and "Honestly, I think that would be a pain in the neck, you know. I don't think I would be able to do that with all these experiences" to be "at least slightly equivocal" and therefore not unqualified statements of bias. Lawler, 194 Wn. App. at 283, 287.

Irby, 187 Wn. App. at 196. We concluded that seating juror 38 was manifest constitutional error requiring reversal and remand for a new trial. Irby, 187 Wn. App. at 197.

Thus, under Irby, a trial court has the duty to strike jurors with actual bias. Irby also demonstrates the distinction between a juror that says they cannot be fair, without redemption, and a juror that only expresses reservations. When the juror has expressed reservations, but agrees they can set those aside to be fair and impartial, it is within the trial court's discretion to allow that juror to remain.

The present case is distinguishable from Irby for two distinct reasons. First, unlike juror 38 in Irby, juror 10 did not express "unqualified statement[s] expressing actual bias." Irby, 187 Wn. App. at 188. While juror 10 admitted domestic violence was an emotional issue, he stated that he did not know how the facts would affect him. Similarly, while he said he did not believe it, he was aware of feelings that African American men are more prone to violence. Juror 10 explained, further, that as a scientist he was trained and held it as a personal principal to be fair and objective and that he believed he "could hear and see what happens in this trial fairly and objectively." Moreover, both the State and Phillips's counsel pressed juror 10 about his ability to be fair, and received responses from him clarifying that he felt he could be fair and consider the case on the merits. He agreed "absolutely" that he could look at the case as instructed and based on the evidence in the case. The trial court did not err in failing to sua sponte excuse juror 10.

Second, this case is also readily distinguishable from Irby because in Irby the defendant both waived his right to counsel and his right to be present at trial. Thus, the

jury was selected without any participation by the defendant. Irby, 187 Wn. App. at 189. As we recognized, "The record reflects that the trial judge and the prosecutor knew that Irby's refusal to participate did not excuse them from the duty of impaneling a fair and impartial jury." Irby, 187 Wn. App. at 196. Phillips, in contrast, was represented by counsel throughout his trial, including voir dire. While a trial court may have a duty to sua sponte intercede where actual bias is evident or where the defendant is not represented by counsel, this duty must also be balanced with the defendant's right to be represented by competent counsel.

In addition to guaranteeing an impartial jury, the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Strickland set forth the standard under the Sixth Amendment for reversal of criminal convictions based on ineffective assistance of counsel. Grier, 171 Wn.2d at 32. The first prong requires determining whether counsel was deficient. In evaluating whether counsel is deficient, we look to whether counsel's conduct could be characterized as a legitimate trial strategy. Grier, 171 Wn.2d at 33. "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). Consequently, where the defendant is represented by competent counsel acting within the confines of Strickland, the trial court should weigh whether counsel's failure to object may be a legitimate trial strategy before sua sponte interceding.

-13-

Here, the record is clear that defense counsel was alert to the possibility of biased jurors. Defense counsel actively questioned juror 10, including questioning whether, despite juror 10's concerns, the juror would follow the court's instructions and base his decision on the evidence presented. As a result, defense counsel did not challenge juror 10. This suggests that defense counsel observed something during voir dire that led counsel to believe juror 10 could be fair. It is also significant that Phillips used his peremptory challenges to strike several jurors, but had one peremptory challenge remaining when he accepted the jury, including juror 10. Again, this suggests that defense counsel either wanted juror 10 on the jury, or did not want one or both the next potential jurors on the panel.

Based on these factors, we hold that the trial court did not abuse its discretion in failing to sua sponte excuse juror 10 for cause.

### III.

Phillips next contends that the trial court abused its discretion when it admitted Sara's victim statement to the responding deputy that Phillips had choked her. We disagree.

### A.

Under ER 801(d)(1)(i), a prior inconsistent statement is not hearsay if: "[t]he declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." "Because such a statement is not hearsay, it is admissible at trial as

substantive evidence, that is, to prove the truth of matter asserted in the statement." State v. Otton, 185 Wn.2d 673, 679, 374 P.3d 1108 (2016).

In determining whether evidence should be admitted under ER 801(d)(1)(i), "reliability is the key." State v. Smith, 97 Wn.2d 856, 861, 651 P.2d 207 (1982). "In many cases, the inconsistent statement is more likely to be true than the testimony at trial as it was made nearer in time to the matter to which it relates and is less likely to be influenced by factors such as fear or forgetfulness." Smith, 97 Wn.2d at 861. A decision to admit or exclude evidence is generally reviewed for an abuse of discretion. State v. Griffin, 173 Wn.2d 467, 473, 268 P.3d 924 (2012).

## B.

At trial, both Talbert and Sara were reluctant to cooperate with the State. Sara testified under subpoena on October 18, 2016. Sara questioned why she needed to testify when the police already had her statement, stating, "you guys have a written statement for that, so what's the purpose of me being here?"

When the State asked Sara about the victim statement she signed on the night of the offense, Sara testified that she did not write the statement, and that it was not in her words. When asked if the statement was what she remembered occurring that evening, she responded, "some of it, yes." Sara was then asked to describe what she meant by "some of it," and she simply stated that she had an "altercation" with Phillips at her house.

In describing the altercation, Sara stated that it got physical with "grabbing and pushing and pulling." Sara denied that Phillips ever punched her in the chin. Sara denied that Phillips pushed her to the ground. Sara then testified that she was unable

to remember whether Phillips choked her. Sara did say she remembered telling the police that Phillips "was grabbing my throat for about a minute and I felt like I was going to pass out," and saying that was the reason she had fallen to the ground, but she reiterated that she did not remember if that happened. Sara testified that she did not remember Phillips kicking her on the ground. When asked if she recalled Phillips grabbing her arm and attempting to push her down the stairs, Sara responded that they were "sitting there both tussling with each other." Sara stated she did not remember if a firefighter came, who talked to her, if she had any pain when the police arrived, or having any bruises or pain in the following days.

The State moved to admit Sara's victim statement as a Smith affidavit, which would allow it to be considered as substantive evidence. Smith, 97 Wn.2d at 861. Phillips objected to the admission, arguing Sara's testimony that she did not remember was not "inconsistent" with the victim statement and because the victim statement had not been shown to be reliable or voluntary.[3]

The trial court ruled that Sara's testimony was inconsistent with her original statement, noting Sara "indicated, for example, that she was not slapped or punched and the statement says that she was punched in the chin." The trial court reserved ruling on whether the statement was truthful and voluntary.

The next day, Sara testified that she did not remember Deputy Spiewak reading her the statement or whether she read it. She also testified that she did not remember

---

[3] After the deputy's testimony, defense counsel stated "With respect to the Smith affidavit, I imagine the Court is likely now satisfied that the foundation has been laid and that the question becomes—at least, from the Defense perspective—that it's the manner in which this becomes admitted." The State argues this was a concession that the affidavit was admissible. This argument is without merit. Simply acknowledging the court's ruling after repeated objections is not conceding an issue or "inviting error" on appeal.

the deputy telling her that she was signing the statement under penalty of perjury before she signed it. Deputy Spiewak testified that after he finished preparing the victim statement he read it back to Sara and told her it was under penalty of perjury, then let Sara read it herself, after which Sara signed the statement.

Following Deputy Spiewak's testimony, the trial court admitted the victim statement as evidence.

## C.

Phillips argues that Sara's testimony about not remembering whether she was choked, kicked, or nearly thrown down the stairs was not inconsistent with her previous statement made to police as required under ER 801(d)(1)(i). We conclude that Sara's statements were inconsistent.

First, as the trial court noted, there were several clearly inconsistent statements made during Sara's testimony. Specifically, Sara denied that Phillips punched her in the chin or pushed her to the ground. Second, the trial judge has considerable discretion in determining whether testimony is "inconsistent" with prior statements. "To be admissible for impeachment purposes, a witness's in-court testimony need not directly contradict the witness's prior statement." State v. Newbern, 95 Wn. App. 277, 294, 975 P.2d 1041 (1999). ""'Inconsistency is to be determined, not by individual words or phrases alone, but by the whole impression or effect of what has been said or done.'"" State v. Dickenson, 48 Wn. App. 457, 467, 740 P.2d 312 (1987) (quoting 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 256 (2d ed. 1982) (quoting Sterling v. Radford, 126 Wash. 372, 218 P. 205 (1923))). This is consistent with federal courts that have long held "inconsistency is not limited to diametrically

opposed answers but may be found in evasive answers, inability to recall, silence, or changes of position." United States v. Dennis, 625 F.2d 782, 795 (8th Cir. 1980).[4]

Here, Sara's forgetfulness was sporadic, and seemed to demonstrate an intent to be evasive, and not actual loss of memory. For example, Sara testified she did not remember being choked, but that she did remember telling the police that she had been choked. The impression or effect of these statements would be that she was never choked by Phillips on the night of the assault, and is undoubtedly inconsistent with her victim statement.

The next issue is whether the statement "was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." An unsworn written statement will satisfy the oath requirement under ER 801(d)(1)(i) if it is signed and contains language such as, "I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct." State v. Nieto, 119 Wn. App. 157, 161, 79 P.3d 473 (2003) (citing RCW 9A.72.085); see also State v. Nelson, 74 Wn. App. 380, 389-90, 874 P.2d 170 (1994). In this case, Sara signed her statement under language stating "I certify (or declare) under penalty of perjury, under the laws of the State of Washington, that the foregoing is true and correct."

---

[4] See also United States v. Barrett, 539 F.2d 244, 254 (1st Cir. 1976) ("To be received as a prior inconsistent statement, the contradiction need not be 'in plain terms. It is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict.'" (quoting Commonwealth v. West, 312 Mass. 438, 440, 45 N.E.2d 260 (1942))); United States v. Williams, 737 F.2d 594, 608 (7th Cir. 1984) (holding a purported change in memory can also produce "inconsistent" answers, "[p]articularly in a case of manifest reluctance to testify"); United States v. Distler, 671 F.2d 954, 958 (6th Cir.), cert. denied, 454 U.S. 827 (1981); United States v. Thompson, 708 F.2d 1294, 1302 (8th Cir. 1983).

-18-

To determine whether the interview was an "other proceeding," courts analyze the facts of the case and the purposes of the hearsay rule. Nieto, 119 Wn. App. at 162 (citing Smith, 97 Wn.2d at 861). In assessing this question, the court considers the reliability of a prior inconsistent statement, using the following factors:

> (1) whether the witness voluntarily made the statement, (2) whether there were minimal guaranties of truthfulness, (3) whether the statement was taken as standard procedure in one of the four legally permissible methods for determining the existence of probable cause, and (4) whether the witness was subject to cross examination when giving the subsequent inconsistent statement.

State v. Thach, 126 Wn. App. 297, 308, 106 P.3d 782 (2005) (citing Smith, 97 Wn.2d at 861-63).

It is well settled that the police obtaining Sara's signed victim statement is one of the four legally permissible methods for determining the existence of probable cause under factor three. Thach, 126 Wn. App. at 309; see also Smith, 97 Wn.2d at 862-63.[5] It is also undisputed that Sara testified at Phillips's trial and that she was subject to cross-examination about her prior written statement. Phillips also does not provide any argument or evidence that the statement Sara made to police, or her signature on the affidavit, was not voluntary. Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration"). Therefore, the only issue is whether there was insufficient evidence to demonstrate there were minimal guaranties of truthfulness under factor two.

---

[5] The four methods are: (1) filing of an information by the prosecutor in superior court; (2) grand jury indictment; (3) inquest proceedings; and (4) filing of a criminal complaint before a magistrate. Smith, 97 Wn.2d at 862-63. The first method "is usually the result of police investigations into alleged criminal activity, and the taking of statements from witnesses and the presentment of them to the prosecuting attorney. The prosecuting attorney then exercises discretion in finding probable cause and files an information." Smith, 97 Wn.2d at 862-63. Such was the method used in Smith, and in this case.

Phillips argues this case is distinguishable from Smith, where the minimal guarantees of truthfulness were satisfied because "the statement was attested to before a notary, under oath and subject to penalty for perjury," and the witness wrote the statement in her own words. Smith, 97 Wn.2d at 862. In this case, Sara did sign the statement under the "penalty of perjury" language, however, Sara testified that she did not read the statement, and that the statement was not in her own words. Phillips contends the penalty of perjury language alone is insufficient by itself to satisfy the minimal guarantees of truthfulness requirement.

In Nelson, this court held the mere fact that the victim did not write the statement herself does not, by itself, render it unreliable. 74 Wn. App. at 389. In Nelson, as in this case, the victim was speaking in a noncoercive environment and was telling the officer what to write down. Although Sara testified that the statement was not in her words and that she did not read the statement, she also testified that she had told the police officer the information in the statement, and simply declared she did not remember if she had been told the statement was made under penalty of perjury. Moreover, Deputy Spiewak testified to reading the statement back to Sara, including the "penalty of perjury" language, and allowing her to read it herself before getting her to sign it. Based on this evidence, the trial court did not abuse its discretion in finding the affidavit satisfies the required minimal guarantees of truthfulness.

## IV.

Phillips next asserts that the trial court erred in entering a no-contact order as to Sara and Talbert because the result impairs his right to parent his infant daughter. We disagree.

A.

The Sentencing Reform Act of 1981, RCW 9.94A.505(8), authorizes the trial court to impose "crime-related prohibitions" as a condition of sentence. State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008). A no-contact order with the victim is a crime-related prohibition and may be imposed for the statutory maximum of the crime when the jury verdict reflects the facts warranting the prohibition. In re Pers. Restraint of Rainey, 168 Wn.2d 367, 376, 229 P.3d 686 (2010) (citing State v. Armendariz, 160 Wn.2d 106, 112, 156 P.3d 201 (2007)).

"[B]ecause the imposition of crime-related prohibitions is necessarily fact-specific and based upon the sentencing judge's in-person appraisal of the trial and the offender, the appropriate standard of review [is] abuse of discretion." Rainey, 168 Wn.2d at 374-75. However, the appellate court reviews conditions interfering with a fundamental constitutional right, such as the fundamental right to one's children, more carefully to ensure that they are "sensitively imposed" and are "reasonably necessary to accomplish the essential needs of the State and public order." Rainey, 168 Wn.2d at 374 (quoting Warren, 165 Wn.2d at 32). "The extent to which a sentencing condition affects a constitutional right is a legal question subject to strict scrutiny." Rainey, 168 Wn.2d at 374 (quoting Warren, 165 Wn.2d at 34).

B.

As a condition of sentence, the sentencing court ordered Phillips to have no contact with Sara and Talbert for the entire term of his sentence. The court did not impose a no-contact order as to Sara and Phillips's infant child. It was confirmed at trial

that Phillips could still see his child, "for example, . . . Phillips'[s] relatives can bring the child to see him."

Sara and Phillips both requested that some contact be allowed, and suggested contact by mail. The trial court denied this request, ruling,

> I am going to impose the no-contact order. I'm not doing it because I want to ignore you. I'm not doing it because I want to punish you. I'm not doing it because I want to deprive a baby of her father. I'm doing it because I don't think I have a safe alternative, so I am going to impose the no-contact order for the statutory maximum in this instance, as well.

The court further explained, "The facts in this case were just too egregious and I don't think that even communication that's nonphysical in nature would necessarily be safe or appropriate." At Sara's request, the court agreed that it would be willing to revisit the issue if Phillips completes an anger management program while incarcerated.

Phillips acknowledges on appeal that the trial court did not impose a no-contact order between him and his child. Phillips instead argues the no-contact order baring any contact with Sara and Talbert makes it impossible for him to parent his child and violates his fundamental constitutional right to raise his child without state interference. U.S. Const. amend XIV; In re Custody of Smith, 137 Wn.2d 1, 13, 15, 969 P.2d 21 (1998), aff'd sub nom. Troxel v. Granville, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion). We reject this argument.

In this case, the court did not restrict communication between Phillips and his child, only between Phillips and Sara and Talbert. Phillips does not contest the legality of the order. All of the cases Phillips relies upon specifically consider no-contact orders directly baring contact between a parent and their child. Although not having contact with Sara will make access to his child more difficult, it does not necessarily restrict

contact between Phillips and his child. Rainey even suggests, "supervised visitation without the mother's presence" as an alternative to a no-contact order with the child. Rainey, 168 Wn.2d at 378.

The State has a compelling interest in preventing future harm to the victims of the crime and in protecting children. Rainey, 168 Wn.2d at 377; State v. Corbett, 158 Wn. App. 576, 598, 242 P.3d 52 (2010). Here, Sara was a victim of the assault, and the jury found the aggravator that Talbert and the infant child were present at the time of the assault. The evidence even demonstrated the infant was in the middle of the physical altercation. It was within the trial court's discretion to enter a 10-year no-contact order, and, based on the facts in this case, doing so was reasonably necessary to protect Sara and Talbert from Phillips.

## V.

Phillips submitted a pro se statement of additional grounds pursuant to RAP 10.10. Phillips's statement is limited to providing three cases in support of two propositions. First, that it is prosecutorial misconduct to include a knowing misstatement or reference to excluded evidence during opening statements. See United States v. Cardenas-Mendoza, 579 F.3d 1024, 1030 (9th Cir. 2009). Second, that the prosecutor erroneously asked Dr. Wigren a hypothetical question that assumed the guilt of the accused. See United States v. Shwayder, 312 F.3d 1109, 1121 (9th Cir. 2002), amended on denial of reh'g, 320 F.3d 889 (9th Cir. 2003); United States v. Laurienti, 611 F.3d 530, 549 (9th Cir. 2010). However, Phillips provides no information as to when the alleged error occurred, whether it was brought to the attention of the trial court, or how it might have resulted in prejudice.

We decline to consider these claims. We consider only issues raised in a statement of additional grounds that adequately inform us of the nature and occurrence of the alleged errors. State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008); RAP 10.10(c). We are also "not obligated to search the record in support of claims made in a defendant's statement of additional grounds for review." RAP 10.10(c). In this case, Phillips's citation to authority, without supporting argument or explanation, is too conclusory to permit appellate review.

## VI.

Phillips filed a supplemental brief challenging the imposition of a $100 fee for collection of DNA. At the time Phillips was sentenced, the collection fee was mandatory. A legislative enactment effective June 7, 2018, added the words "unless the state has previously collected the offender's DNA as a result of a prior conviction." RCW 43.43.7541; Second Substitute H.B. 1783, § 18, 65th Leg., Reg. Sess. (Wash. 2018). This amendment applies prospectively to cases pending on appeal. Ramirez, 191 Wn.2d at 747-50. The State concedes that Phillips's DNA was previously collected prior to sentencing and is on file with the Washington State Patrol Crime Lab and that remand is appropriate. We accept the State's concession and agree.

We remand to the trial court for a ministerial order striking the $100 DNA fee.
We otherwise affirm Phillips's conviction and sentence.

_____ Mann, ACJ

WE CONCUR:

_____          _____