IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 85886-6-I |
| Respondent, | |
| v. | DIVISION ONE |
| ARCHIE BOCO BIAWOGEE, | UNPUBLISHED OPINION |
| Appellant. | |

DÍAZ, J. — Archie Boco Biawogee fired a handgun into a car occupied by three women, including Zephenia Card, the driver and mother of his children. A jury convicted Biawogee of three counts of assault in the second degree. At sentencing, the court imposed a 10-year domestic violence no-contact order (NCO), forbidding him from contacting Card. Biawogee now claims that insufficient evidence supported the convictions as to the two passengers, that the prosecution twice committed misconduct, and that the NCO violates his parental rights. Biawogee also filed two statements of additional grounds (SAG), primarily claiming double jeopardy barred his retrial. We affirm his convictions and sentence.

## I.     BACKGROUND

At trial, Karmalika White testified that the following events occurred on the night of October 18, 2018, some of which were captured on video.

After work, White met up with Card and Denija Irving. Eventually, they went to White's apartment complex. Concurrently, White noticed Biawogee was "blowing [Card's] phone up" and he "wouldn't stop calling, and then she finally answered." Card hung up and appeared to be "panick[ing] and scared." The three women then decided to leave for Irving's home because they "d[id]n't feel safe" and Biawogee "d[id]n't know where" Irving lived. All three women got in a BMW i3. Card drove, Irving sat in the front passenger seat, and White sat in the middle back seat.

White further testified that, as they were leaving, they saw Biawogee's "car right in front of us as we're pulling out by the mailboxes." "It[] [was] like almost a head-on head collision" and, "as [Biawogee] stops the car in front of [them], he gets out." White then "notice[d] [Biawogee's] left hand on his waistband and [she was] freaking out, everybody's freaking out" because "you could see the gun a little between the waistband and his stomach." Biawogee appeared "really angry," quickly approached the BMW, and started "banging" on the driver's side window. "We started getting freaked out even more" and Card "reversed back to go forward to leave." "As we move[d] forward to leave, we just hear[d] this loud popping sound and [White] hear[d] glass shattering" from the driver's side window. The bullet did not strike any of the three victims. They escaped in the BMW and called 911.

The State charged Biawogee with one count of assault in the first degree (domestic violence) as to Card and two counts of assault in the second degree as to White and Irving. At trial, the court instructed the jury on the lesser included offense of assault in the second degree as to Card.

2

In June 2023, the parties went to the trial at issue. Of the three victims, only White testified. Ultimately, the jury found Biawogee guilty of three counts of assault in the second degree. The jury also found Biawogee and Card were intimate partners at the time of the offense and that a firearm was used.

The court sentenced Biawogee to 54 months of confinement. The court also entered an NCO barring Biawogee from contacting Card until October 2033. The NCO did not directly address their two children. Biawogee timely appeals with the assistance of counsel and he also filed two nearly identical SAGs.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Biawogee claims his convictions for assault in the second degree solely as to White and Irving were supported by insufficient evidence. He does not challenge his conviction for assault in the second degree against Card.

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt" for every element. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Id. As a result, this "standard is a deferential one, and questions of credibility, persuasiveness, and conflicting testimony must be left to the jury." In re Pers. Restraint of Martinez, 171 Wn.2d 354, 364, 256 P.3d 277 (2011).

"[A]ssault is not defined in the criminal code" and thus "courts have turned to [three] common law" definitions, which include "putting another in apprehension of harm." State v. Elmi, 166 Wn.2d 209, 215, 207 P.3d 439 (2009).

At oral argument, Biawogee's appellate counsel agreed the State needed to establish only one of the three common law definitions for assault. Wash. Ct. of Appeals oral argument, State v. Biawogee, No. 85886-6-I (May 30, 2025), at 1 min., 20 sec. through 1 min., 37 sec. video recording by TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2025051198. Indeed, an "instruction that set[s] forth the three common law definitions of assault" separately from the to-convict instructions "do[es] not create alternative means of committing the crime." State v. Smith, 159 Wn.2d 778, 780, 154 P.3d 873 (2007). Thus, we will only consider Biawogee's arguments under the "apprehension of harm" definition of assault.

The court's unchallenged "[t]o convict" instructions for assault in the second degree required the State prove Biawogee "assaulted" White and Irving "with a deadly weapon." RCW 9A.36.021(1)(c); see also 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 35.19, at 531 (5th ed. 2021) (WPIC).

And, the court's unchallenged instruction defining apprehension of harm provided that "assault is also an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a

4

reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury." See WPIC 35.50, at 619.

As no party objected to the above instructions, they serve as the "'law of the case'" and "'are treated as the properly applicable law for purposes of appeal.'" State v. Johnson, 188 Wn.2d 742, 755, 399 P.3d 507 (2017) (quoting Roberson v. Perez, 156 Wn.2d 33, 41, 123 P.3d 844 (2005)); State v. France, 180 Wn.2d 809, 816, 329 P.3d 864 (2014) ("the law of the case doctrine applies to all unchallenged instructions, not just the to-convict instruction."); State v. Calvin, 176 Wn. App. 1, 21, 302 P.3d 509 (2013) (holding the doctrine applies to "definitional instructions").

As presented at oral argument, Biawogee argues that "reasonable apprehension of harm requires both *intent* to place a person in reasonable apprehension of harm and the *result*, that the person is actually placed in reasonable apprehension of harm." Wash. Ct. of Appeals oral argument, supra at 1 min., 43 sec. through 1 min., 54 sec.; see also State v. Toscano, 166 Wn. App. 546, 551, 441, 271 P.3d 912 (2012) (noting "[a]ssault requires specific intent to create the apprehension of harm" and utilizing a similar intent-result two-step). And he avers that there is insufficient evidence for both intent and result. We address each in turn.

As to Biawogee's specific intent, he argues "there was no evidence that [he] intended to place Ms. Irving or Ms. White in apprehension of harm—or even that he was aware at the time of the shooting that they were in the vehicle with Ms. Card." We disagree.

According to White's testimony, all three women sat in a BMW i3, a "small"

"smart car." White sat in the middle back seat while Irving sat in the front passenger seat. Further, Biawogee approached the BMW and was "banging" the driver's side window soon before the shooting. She also claims the BMW's windows were not tinted. Thus, a juror could draw the reasonable inference that both White and Irving were plainly visible from Biawogee's point of view next to the car. Salinas, 119 Wn.2d at 201.

White also testified she saw Biawogee's hand near a gun tucked in his waistband and that he looked "really angry" as he rapidly approached the BMW. And soon before the shooting, Biawogee started "banging on the side of the window." Interpreting White's testimony "most strongly against the defendant" as we must, a juror could further draw the reasonable inferences that Biawogee's actions not only indicated he was aware of Irving and White, but specifically intended to place both in a reasonable apprehension of harm. Salinas, 119 Wn.2d at 201.

Our Supreme Court's recent decision in In re Pers. Restraint of Arntsen—where it upheld a conviction for assault in the second degree—is instructive. 2 Wn.3d 716, 719, 721, 724, 543 P.3d 821 (2024). There, a road rage victim "testified that her 'first thought' when she saw Arntsen approaching her with the rifle was, 'I'm going to get shot.'" Id. at 721. Arntsen alleged the State lacked sufficient evidence of his "specific intent to create the victim's actual apprehension and fear." Id. at 724. The Court disagreed and held, "[a]lthough [Arntsen] did not point the rifle directly at [the victim], the jury could infer from [the witnesses'] testimony that he intended to make her fear he might harm her with it." Id. at 726.

6

Here too, White similarly testified Biawogee aggressively approached the BMW with his hand near a gun tucked in his waistband.[1]

Thus, we hold there is sufficient evidence to draw a reasonable inference that Biawogee specifically intended to place White and Irving in apprehension of harm. Salinas, 119 Wn.2d at 201.

As to whether his actions *resulted* in the victims being placed in reasonable apprehension of harm, Biawogee argues that there was no such evidence because "Ms. White testified that she did not see Mr. Biawogee aim or point his weapon" before the shooting and "became aware of the shooting [only] as it happened," i.e., "when she heard the gunshot," while Irving did not testify. At oral argument, Biawogee's appellate counsel acknowledged White and Irving were certainly "afraid," but argued the evidence does not support further finding they were apprehensive of harm.[2] Wash. Ct. of Appeals oral argument, supra at 21 min., 16

---

[1] Biawogee attempts to distinguish Arntsen by arguing the court "addresse[d] what the prosecution must do to prove intent to place a person in reasonable apprehension, not whether a person is actually placed in reasonable apprehension." We disagree. Biawogee's argument disregards the fact that our Supreme Court also was considering whether there was sufficient evidence that actual apprehension and imminent fear were created, and relied on the victim's above quoted testimony to conclude there was. Arntsen, 2 Wn.3d at 731. In other words, our Supreme Court relied on the same fact—the defendant approached the victim's vehicle with a firearm, similar to White's testimony here—to provide evidentiary support for both the defendant's intent to cause fear and the victim's apprehension of fear. Biawogee thus points to a distinction without a difference.

[2] Specifically, Biawogee's appellate counsel argued

"there is no disputing that everyone involved in this situation was afraid at points. But being afraid and being in reasonable apprehension of harm, imminent harm, are not identical. And there is a timing issue there, and it also has to do with what you are afraid of. Because being afraid someone else will be harmed, including someone you love or are close to, and where it is very upsetting for you is not the same thing. So, your fear that your friend has been

7

sec. through 21 min., 55 sec. We again disagree.

Biawogee relies on State v. Abuan, 161 Wn. App. 135, 257 P.3d 1 (2011), to argue that "no Washington court has ever determined that reasonable apprehension of bodily harm can be inferred in absence of a firearm pointed directly at the victim." We disagree with that statement of law.

This court in Abuan did hold that "no Washington case extends Miller to situations where a gun is not directly pointed at the victim." Id. at 159 n.11. In State v. Miller, "the defendant pointed [the gun] at [the officer]" and the court held the "fact that an officer may have the courage and skill to disarm a person does not mean that he is devoid of apprehension when a gun is pointed at him. Such attributes of courage and skill are not confined to James Bond and other current film characters." 71 Wn.2d 143, 146, 426 P.2d 986 (1967). Accordingly, and contrary to Biawogee's presentation of the matter, the Court in Miller held "'[a]pprehension of a person at whom a revolver is pointed may be inferred, unless he knows it to be unloaded.'" Abuan, 161 Wn. App. at 159 (quoting Miller, 71 Wn.2d at 146). Thus, Miller and Abuan are inapplicable here, and this court in neither case required, as a matter of law, that a defendant point a firearm at a victim to establish the victim's apprehension of harm.

Further, Abuan involved a situation where the victim "did *not see the shooter or the gun*, and [the victim] was in the house where he could not see any shooting."

---

shot or is about to be shot is not apprehension of harm within the assault statute."
Wash. Ct. of Appeals oral argument, supra, at 21 min., 16 sec. through 21 min., 55 sec.

161 Wn. App. at 159 (emphasis added).  Here in contrast, White testified she saw Biawogee's hand near the gun in his waistband, that he was at the front driver's side window, and the bullet he fired entered the small BMW i3 car where all three women were seated.  And White at no time testified she knew the gun was unloaded. Thus, Biawogee's reliance on <u>Abuan</u> and by extension <u>Miller</u> is inapposite.

Finally, Biawogee also relies on <u>State v. Bland</u>, 71 Wn. App. 345, 860 P.2d 1046 (1993).  There, this court held an alleged victim "did not experience apprehension or fear" because he was asleep "before" and "at the time" the bullet entered his window and there was no evidence "that he feared future injury *after* the bullet came through his window."  <u>Bland</u>, 71 Wn. App. at 355.  <u>Bland</u> is distinguishable.

Here, in contrast to <u>Bland</u>, the evidence supports White and Irving being reasonably apprehensive of harm before and during the shooting.

Before the shooting, White testified that after Biawogee's calls to Card, "*we* [didn't] feel safe, *we* need[ed] to hurry up and leave, because he knows where *we* stay." (Emphasis added.)  As Biawogee approached their vehicle, White explained she was "scared for [her] safety" after she saw his hand near his gun and his "really angry" demeanor.  Further, when Biawogee started "banging on the side of the window . . . *we* started even getting freaked out even more."  (Emphasis added.) White's cell phone video also shows her hastily, if not frantically, telling Card to "[g]o, go, go, go" in the moments before the shooting.  Viewed in a light most favorable to the State, this evidence evinces their collective and her own individual

fear. Salinas, 119 Wn.2d at 201.

During the shooting, White testified that, as they tried to leave she "hear[d] a gunshot, I hear[d] glass and I hear[d] [Irving] screaming like crazy. I almost thought somebody got hit. Like the way [Irving] was yelling, I've never heard that a day in my life. It was really, really scary" and she "was just scared *of my life. I didn't want to get hit or anything.*" (Emphasis added.) White testified her "anxiety went from zero to a hundred" as she "didn't want to die." She also explained how both she and Irving imminently feared being struck and harmed by the bullet. White's cell phone video also captured both Irving screaming after the gunshot and White asking if anyone was hit by the bullet. Thus, the record supports a reasonable inference that during the shooting both White and Irving were reasonably apprehensive of imminent harm from the discharge itself.

As "all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant," we hold the above evidence is sufficient to support Biawogee's convictions. Salinas, 119 Wn.2d at 201. We do not reach the other bases of the assault.

B.     Prosecutorial Misconduct

Biawogee argues the State also committed prosecutorial misconduct by misrepresenting the record or arguing facts outside the record in two instances during its opening and closing arguments.

We review prosecutorial misconduct claims for abuse of discretion. State v. Ish, 170 Wn.2d 189, 195, 241 P.3d 389 (2010) ("The trial judge is generally in the best position to determine whether the prosecutor's actions were improper.").

10

A prosecutor serves "as the representative of the people" and "[d]efendants are among the people the prosecutor represents." State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). The State thus "owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated." Id.; CONST. art. I, § 22; U.S. CONST. AMEND. VI. "Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012).

To show prosecutorial misconduct, a defendant must establish both impropriety and prejudice. State v. Azevedo, 31 Wn. App. 2d 70, 78, 547 P.3d 287 (2024). For impropriety, a "prosecutor has wide latitude to argue reasonable inferences from the evidence," State v. Thorgerson, 172 Wn.2d 438, 453, 258 P.3d 43 (2011), but "[r]eferences to evidence outside of the record and bald appeals to passion and prejudice constitute misconduct." State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). Our analysis must also be "viewed within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions.'" Azevedo, 31 Wn. App. 2d at 78 (quoting State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003)). We reach only the propriety of the State's challenged conduct below.

1. Biawogee's Knowledge and Concern for Others in the Car

Biawogee first challenges the State's claim, in both its opening statement and closing argument, that he knew White and Irving were in the car but "'did not care.'" Specifically, in opening, the State asserted over objection that Biawogee "fired a shot into the car knowing she had two friends with her. He did not care."

Similarly, in closing, the State argued over objection that Biawogee fired the gun, "[k]nowing that she had two friends with her, he did not care."

Biawogee now claims that there "was simply no evidence at trial from which [these two claims] could be inferred." We disagree.

Despite Biawogee claiming a complete lack of evidence, he acknowledges that there is a "suggestion" that he knew White and Irving were in the car based on a "jail phone call after charges had been filed," admitted at trial, "in which he speculates that the multiple charges were associated with the other people in 'the car.'" This fact alone could provide the evidentiary foundation for the propriety of the State's statements.

Biawogee's argument is also contrary to other portions of the record, even if we were to disregard the jail phone call. As discussed above, White testified that Biawogee was close to an un-tinted window of the small car. This testimony supports the reasonable inference that the victims were visible and, thus, Biawogee observed them in the car. Thorgerson, 172 Wn.2d at 453.

With such knowledge, it is also a reasonable inference, particularly under the "wide latitude" afforded prosecutors, id., that Biawogee was unconcerned with their safety after he then chose to fire the gun at the car, and all its occupants, who were in that enclosed space. We thus hold Biawogee failed to establish the State's statements on his knowledge or concern for White and Irving were improper. We do not reach the prejudice prong of this claim.

2. Whether Biawogee's Firearm Could Accidentally Discharge

Biawogee next claims the State committed misconduct when it argued in

closing over objection that the type of firearm he used would not just "'go off'" without him intentionally pulling the trigger.  Specifically, the State asserted that Biawogee "raised the gun . . . placed his finger on the trigger" and "squeeze[d] the trigger and the bullet [was] released . . . [t]here [was] no other means of a bullet being fired. The shooting did not occur accidentally. The gun did not just go off." Biawogee claims the argument is improper because there "is no evidence in the record to support this claim."  We address this argument's two component parts below.

First, Biawogee argues that "there was no evidence at trial about the specific weapon at issue here or its functionality."  His claim of a complete lack of evidence is contrary to the record.

It is undisputed that the State did not introduce Biawogee's firearm as evidence at trial.  However, White identified Biawogee's firearm as a 9-millimeter handgun at trial and as a "Glock" in an officer's body camera video from the night of the incident.  The jury also received a physical exhibit of and heard testimony on a 9-millimeter bullet casing recovered from the scene of the shooting.  Thus, there was sufficient evidence of the type of weapon used.

Second, Biawogee argues that, "[e]ven setting aside mechanical failure, there was no evidence in the record to support the claim that *a* gun cannot be fired accidentally."  This argument is also contrary to the record.

Even Biawogee acknowledges that the jury heard "testimony from several officers that their service weapons would not 'just go off.'"  Specifically, the State asked four different officers on the general functionality of Glocks or 9-millimeter

handguns. The first officer testified "most modern firearms are built" with "safeties that are only defeated if the trigger is pressed." He elaborated that "Glock[s] specifically ha[ve] three different safeties" and require the trigger be pressed with "[f]ive and a half pounds" of force. The second officer testified that "[n]ot a whole lot" of force is required to discharge his 9-millimeter firearm. That officer also responded "[n]o" when asked whether "waving it around" would cause it to "just go off?" The third officer responded "never" and "[n]o, not based on my training and experience," when asked whether her Glock 9-millimeter firearm could "go off without pulling the trigger[.]" The fourth officer also responded "[n]o" when asked whether his Glock 9-millimeter firearm "ever fire[s]" "[w]ithout pulling the trigger[.]"

Thus, the State properly exercised its "wide latitude" in arguing that Biawogee had a Glock or 9-millimeter handgun at the time of the shooting and that this type of firearm would not "just go off" accidentally. Thorgerson, 172 Wn.2d at 453. In turn, Biawogee fails to establish the State's conduct was improper. Again, we need not "then determine whether [Biawogee] was prejudiced." Azevedo, 31 Wn. App. 2d at 78.

C.     Biawogee's Parental Rights and the NCO

Biawogee's NCO prohibits him from contacting Card, "directly, indirectly, in person or through others" until October 2033, which is the maximum sentence of the crime. RCW 9A.36.021(2)(a); RCW 9A.20.021(1)(b). The NCO does not directly restrict contact between Biawogee and his two children. But the record does indicate one of Biawogee's children lives with Card while the other lives with Biawogee's sister.

14

At sentencing, Biawogee stated he "d[id]n't have any objection" to the NCO so long as it "at a minimum" accounted for "third-party contact to allow for communication about the children and make sure that the children are taken care of" as the "custody situation hasn't totally been worked out yet." Ultimately, the NCO allows Biawogee to contact Card solely "for mailing or service of process of court documents through a third party" or through his "lawyers," but declined to allow for broader third-party contact.

Biawogee now argues that, "[w]ithout third party contact, there is no way for [him] to arrange for visitation or phone calls with his child" who lives with Card, meaning the NCO is "not narrowly drawn or necessary to prevent harm." We disagree.

It is true that "[p]arent[s] ha[ve] a fundamental constitutional right to the care, custody, and companionship of their children." State v. DeLeon, 11 Wn. App. 2d 837, 841, 456 P.3d 405 (2020). And, while sentencing conditions are generally reviewed for abuse of discretion, "we more carefully review conditions that interfere with a fundamental constitutional right, . . . such as the fundamental right to the care, custody, and companionship of one's children." In re Pers. Restraint of Rainey, 168 Wn.2d 367, 374, 229 P.3d 686 (2010). "Such conditions must be 'sensitively imposed' so that they are 'reasonably necessary to accomplish the essential needs of the State and public order.'" Id. (quoting State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008)).

In support, Biawogee first cites to State v. McGuire, 12 Wn. App. 2d 88, 456 P.3d 1193 (2020). There, the trial court entered a 10-year NCO prohibiting contact

between McGuire and his former girlfriend who was pregnant with their child. McGuire, 12 Wn. App. 2d at 91. McGuire argued the NCO interfered with his fundamental parental rights as it "fail[ed] to provide *any* exception for contact through the courts or counsel." Id. at 95 (emphasis added). This court agreed, reasoning that, "[b]ecause the no contact order prohibited *all* contact, including contact through the court or counsel . . . the act of pursuing a parentage action would itself violate the no contact order." Id. at 96-97 (emphasis added). Here, unlike McGuire, the NCO expressly allows Biawogee to contact Card either through counsel or by serving legal documents through a third party. Thus, the key animating concern in McGuire is absent here.

Biawogee's remaining arguments are also unpersuasive. He next argues the NCO "require[s him] to initiate a court proceeding in order to communicate with his young child." This argument is contrary to the NCO's actual text, which has no such requirement and does not expressly limit him from contacting any of his children through any person other than Card. See State v. Phillips, 6 Wn. App. 2d 651, 675-76, 431 P.3d 1056 (2018) (upholding an NCO which did not apply to the defendant's children and allowed relatives to facilitate communication between him and his children).

Biawogee next, acknowledging the NCO's third-party exception, argues it "has no practical effect on [his] ability to exercise his right to parent while he is indigent and incarcerated." He then argues "Card is likely already in some communication with [his] sister" and "[p]rohibitng [his] sister from communicating with Ms. Card on his behalf in order to arrange phone calls or visits between [him]

and his child is not necessary for any legitimate purpose of the state." We again disagree.

This court held in State v. Foster that that mere "inconvenience" was insufficient to overturn an NCO, as the father there "always had the ability to ask the family court to establish visitation rights with his daughter and avoid contact" with the protected party. 128 Wn. App. 932, 940, 117 P.3d 1175 (2005); see also Phillips, 6 Wn. App. at 676 ("Although not having contact with [the victim] will make access to his child more difficult, it does not necessarily restrict contact between Phillips and his child."). Biawogee's arguments—which similarly reduce to a series of serious but not prohibited inconveniences—are insufficient.[3]

We thus hold Biawogee failed to establish that the court abused its discretion or that the NCO unlawfully violates his fundamental parental rights. Rainey, 168 Wn.2d at 374.

D.    SAG: Double Jeopardy and Retrial

Biawogee also submits two nearly identical SAGs challenging his retrial. He primarily argues that the prosecutor "intentionally cause[d]" a mistrial in the first trial of this action and that therefore retrial should have been "barred by double jeopardy."[4] We disagree.

Biawogee's first trial began on March 28, 2023. On April 3, 2023, Biawogee

---

[3] Under GR 14.1, we note this court recently rejected a similar challenge to an NCO in State v. Boswell, No. 85072-5-I, slip op. at 3-7 (Wash. Ct. App. Jun. 24, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/850725.pdf.

[4] Biawogee also argues the court "should have dismiss[ed] the case pursuant to CrR 8.9 which allow[s] court[s] to dismiss case[s] due to government misconduct." SAG at 1. CrR 8.9 addresses judicial disqualification, not motions to dismiss. Biawogee likely meant to cite CrR 8.3(b) upon which his original motion to dismiss

moved to dismiss or in the alternative for a mistrial under CrR 4.7 and 8.3(b), citing the State's late disclosure of White's criminal history and of her cell phone video, among other reasons. The State objected to the mistrial. The court denied his motion to dismiss but granted the mistrial on those grounds. In June 2023, Biawogee unsuccessfully moved to dismiss and prevent a retrial.

The standard of review for retrial "differ[s] dramatically depending on whether the defendant requested the mistrial or whether the State sought a mistrial over the defendant's objection." State v. Robinson, 146 Wn. App. 471, 478, 191 P.3d 906 (2008). "When the defendant requests a mistrial, double jeopardy does not bar retrial." Id. at 478-79. That is, a "retrial does not place a defendant in double jeopardy after the defendant requests and is granted a mistrial because, in so doing, the defendant voluntarily chooses to terminate the first trial before the jury's verdict."[5] Id. at 478 n.3.

Here, Biawogee's original motion to dismiss listed mistrial as an alternative remedy. During the hearing on the motion, he acknowledged the court "could, I suppose, find a mistrial," but argued that "there is not a remedy short of dismissal

---

relied. Still, Biawogee identifies no specific error or abuse of discretion and simply expresses a generalized disapproval of the court's decision. Thus, we need not consider his argument further. RAP 10.10(c) (noting that while "[r]eference to the record and citation to authorities are not necessary or required . . . the appellate court will not consider a defendant's [SAG] if it does not inform the court of the nature and occurrence of alleged errors.").

[5] The United States Supreme Court presented a similar standard in Oregon v. Kennedy, on which Biawogee's SAG relies. 456 U.S. 667, 676, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982) ("'A defendant's motion for a mistrial constitutes 'a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact.'") (quoting United States v. Scott, 437 U.S. 82, 93, 98 S. Ct. 2187, 2195, 57 L. Ed. 2d 65 (1978)).

that's going to cure this misconduct." This prioritization of arguments does not change the fact that it was Biawogee, not the State, who requested the mistrial, which defeats his double jeopardy claim here, per Robinson.

As to the claim that the State *intentionally* provoked a mistrial, the court found the State's late disclosures amounted to misconduct but did not further find such misconduct was calculated to provoke a mistrial. In such a situation, ample case law defeats this argument. See State v. Cochran, 51 Wn. App. 116, 118, 120-21, 751 P.2d 1194 (1988) (where, although the parties stipulated the State "intentionally withheld" evidence, the court did not further "find any evidence of deliberate or intentional prosecutorial misconduct regarding the trial itself . . . Even if the withholding of information had been grounds for a mistrial, the prosecution did not act in a manner calculated to provoke or goad Cochran into requesting a mistrial.").

We thus hold Biawogee failed to establish double jeopardy barred retrial of this matter. Robinson, 146 Wn. App. at 478.

### III. CONCLUSION

We affirm Biawogee's convictions.

Díaz, J.

WE CONCUR:

Feldman, J.

Cheung, J.

19