**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Parentage of:<br><br>R.V. | No.  55303-1-II<br><br>PUBLISHED OPINION |

PRICE, J. — C.V. filed a petition to determine the parentage of a child, R.V., asserting that he was the child's father.  In response, H.S., R.V.'s mother, filed an allegation of sexual assault claiming that R.V. was born as a result of sexual assault by C.V. and requesting that he be denied parental rights under RCW 26.26A.465, which precludes establishment of parentage by a perpetrator of sexual assault.  After a fact-finding hearing, the trial court found that R.V. was born as a result of C.V.'s sexual assault of H.S. and, therefore, C.V. did not have parental rights with regard to R.V.

C.V. appeals the trial court's order.  First, C.V. argues that there was insufficient evidence to support the trial court's determination that R.V. was born as a result of a sexual assault.  Second, C.V. argues that RCW 26.26A.465 violates his due process and equal protection rights—rights he asserts are rooted in his fundamental right to parent.  We disagree with both of his arguments.  We determine that there was sufficient evidence for the trial court's finding of sexual assault, and we hold that perpetrators of sexual assault have no fundamental due process rights to parent children born as a result and are not similarly situated to established parents for the purposes of the equal protection analysis.  Accordingly, we affirm the trial court.

No. 55303-1-II

## FACTS

### I. BACKGROUND

C.V. and H.S. met when H.S. was homeless in 2012. At the time, C.V. was living with Susana Godinez and their four children. Shortly thereafter, H.S. moved in with C.V., Godinez, and the children.

In 2015, C.V. was convicted of possession of a controlled substance with intent to deliver and ultimately sentenced to 112 months in prison. Just after C.V. was sentenced, H.S. discovered she was pregnant with C.V.'s child. She gave birth to R.V. in August 2016, approximately nine months after C.V. was incarcerated.

### II. PETITION TO DECIDE PARENTAGE

In 2019, C.V. filed a petition to decide parentage of R.V. In response, H.S. filed a sexual assault allegation stating that C.V. had repeatedly sexually assaulted her from 2013 to 2015 and R.V.'s birth was a result of a sexual assault. H.S. requested, pursuant to RCW 26.26A.465, that the court deny C.V. any rights as a parent of R.V. because his conception was the result of sexual assault.

C.V. denied the allegation, maintaining that he and H.S. had been in a loving and peaceful relationship and requested a fact-finding hearing.

### III. FACT-FINDING HEARING

A. TESTIMONY FOR H.S.

1. H.S.'s Testimony

H.S. testified at the fact-finding hearing that C.V. had been abusive toward her in the five years prior to his incarceration. H.S. also testified that from the time she had first started living in

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55303-1-II

C.V.'s home, he threatened her and told her not to leave without his permission. For example, she went out for a walk the first night she was at the home while C.V. was spending a couple nights in jail. When C.V. found out, he said, "Don't you ever go anywhere. . . . I'm gonna F you up when I get out of here. You just wait and see." Verbatim Report of Proceeding (VRP) at 117. Later, she attempted to leave in a car, but C.V. chased her down with a gun and shot at her. H.S. also tried to leave on other occasions, but she said similar threats from C.V. against her and her family prevented her from doing so.

H.S. also testified that C.V. did not allow her to have a phone, and although at times she would obtain a prepaid phone, C.V. would take it from her when he found out. And, she did not have access to a vehicle.

H.S. said that, at some point, C.V. rented a building and locked her in it. C.V. chained the doors so that H.S. could not leave and then would come back and sexually assault her. H.S. said that when she told C.V. that she did not want to have sex, he pistol whipped her. On a subsequent occasion, C.V. came into H.S.'s room, and she told C.V. that she did not want him to touch her. In response, C.V. slashed H.S.'s mattress with a knife until she let him penetrate her. On other occasions, C.V. behaved in a similarly threatening manner wielding a gun or a knife when he wanted to have sex with H.S.

In the months prior to C.V.'s incarceration, and during the time period in which R.V. was conceived, H.S. was living in C.V.'s garage in a makeshift bedroom. C.V. would make markings on the door where H.S. was staying to ensure she did not leave without his permission. H.S. testified:

3

No. 55303-1-II

> I was only allowed to leave when [C.V.] gave me permission to leave. I didn't go into the kitchen unless I had permission to go into the kitchen. I didn't go outside unless I had permission from him to go outside. And he was not home a lot of the time, so I would just sit there and wait, and wait, and wait for somebody.

VRP at 124. At times, H.S. was not allowed to leave the garage for more than 48 hours.

During the time period when R.V. was conceived, C.V. repeatedly threatened H.S., saying that he was going to get her pregnant so that she could never leave him, and he would force her to have intercourse with him by using violence. H.S. said that when she would tell C.V. that she did not want to have sex with him, he would brandish his gun or another weapon to threaten her and then get on top of her. On multiple occasions, C.V. held a pillow over H.S.'s face so that she could not breathe. She testified that she would try to resist:

> I was kicking my legs and swinging my arms and he would use his arms and like his elbows and hold my arms down, and he would use all of his body weight to hold the rest of my body down, and he would just leave the pillow on my face, and I would be screaming under my breath, "Please, I'll stop. I'll be good. I'll listen. I'm so sorry." I have never experienced that close to near death before. I mean, I can't even explain the feeling of being suffocated.

VRP at 126-27. Afterwards, C.V. would bring gifts to H.S. like clothes and jewelry as an apology for his actions.

Immediately after C.V. went to prison, H.S. moved in with her mother. Two days later, she found out she was pregnant with R.V. There was no evidence that H.S. had intercourse with anyone other than C.V. during the time period of R.V.'s conception.

H.S. testified that C.V. sent her letters while he was in prison. In one letter, C.V. wrote that he had been waiting for her to send him pictures and he was going to beat someone up if she did not. Frightened for herself and others, H.S. sent C.V. pictures.

4

No. 55303-1-II

In another letter, C.V. said, "I will never let you go. You are for me and only me. I hope you know that if you are not for me, you are for nobody. . . . Well anyway I will fight anybody for you and for your love." VRP at 133. H.S. interpreted the letter to mean that she could not have another person in her life or be in a relationship with another man. H.S. believed that if she was not with C.V., he might kill her.

H.S. testified that she felt threatened by the contents of the letters and was fearful for herself and others. Moreover, C.V.'s repeated statements that he was going to get out of prison and come home soon made her feel like, unless she did what he asked, he would hurt her and her family when he got out.

H.S. admitted to having sent several letters and pictures to C.V. while he was in prison saying that she loved him and she was glad they were having a baby, but H.S. maintained that she wrote the letters out of fear. H.S. also admitted to having visited C.V. in prison on multiple occasions and asking him to sign an acknowledgement of paternity. She had not sought a protection order against C.V. until after he brought the paternity action but said that was also out of fear. Additionally, H.S. admitted that around the time she stopped contacting C.V., she became romantically involved with someone else.

2. Additional Testimony

Other witnesses corroborated aspects of H.S.'s testimony. Pat Meyers, a retired police officer and friend of H.S.'s mother, testified that in August 2015, H.S.'s mother called and informed him that H.S. had told her she had been abused and asked for his help to pick her up. When they got to where H.S. was, she ran to the vehicle, got in, and said, "Let's go, let's go, let's

5

No. 55303-1-II

go. He's looking for me. He said he's going to kill me." VRP at 165. H.S. appeared scared and hysterical. While they drove, H.S. received multiple phone calls from C.V. as she sat crying.

Regarding H.S.'s testimony that C.V. owned and used guns, Meyers was shown pictures of C.V. and his children holding guns and pointing the weapons at the camera. Meyers testified that in his opinion as a former law enforcement officer, the guns appeared real.

H.S.'s mother testified consistent with Meyers' testimony about the evening that they had picked up H.S. She also said that the next day, C.V. showed up and took H.S. back to his home. She said that while H.S. was living with C.V., she was rarely able to talk with H.S. During the phone conversations they did have, she could hear violence in the background. She would hear screaming and H.S. saying things like "Don't hit me," or "Leave me alone." VRP at 175. When she saw H.S. in person, her arms were bruised and one time there was bruising around her eyes.

The mother said that after C.V. went to prison, H.S. called and asked her to come get her. C.V.'s home was located in a very remote, difficult to reach area. When she arrived, H.S. was thin, dirty, and bruised, and she told her mother that C.V. had been beating her and forcing her to have sex with him. Later, C.V. called the mother's home multiple times and threatened that when he got out of jail he was going to take H.S. and "take care of [H.S.'s mother]." VRP at 180.

H.S.'s cousin also testified. She said that when H.S. was living with C.V., she witnessed H.S. with a black eye. H.S. told her that C.V. had hit her and was forcing her to do things she did not want to do. She said H.S. had called her at one point, but C.V. took the phone, told her he was listening, and then she heard H.S. say, "Stop hitting me" in the background before hanging up. VRP at 191.

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55303-1-II

B. TESTIMONY FOR C.V.

1. C.V.'s Testimony

Prior to the fact finding hearing, C.V. filed a series of declarations that disputed nearly all of H.S.'s allegations. C.V. stated that he had never threatened or abused H.S. but that they were lovers and H.S. had wanted to get pregnant. He maintained that H.S. had frequently visited him and communicated with him while he was in prison and provided copies of visit logs and communications to support his statements. C.V. said that while he had been in prison, H.S. became involved in a relationship with someone else and had filed the petition because she wanted C.V. "out of the picture." Clerk's Papers at 291. C.V. also submitted declarations from himself and other persons who knew him and H.S. to support his statements. In addition, C.V. supplied evidence of payments he had sent to H.S. to help support R.V.

At the fact-finding hearing, C.V. continued to tell a very different version of events. He stated that there were several vehicles available for H.S.'s use and that after she had lived there for about a year, C.V. purchased for H.S. a car of her own. Starting in 2013, H.S. had told him that she wanted to "have [his] baby," and they were actively trying to get pregnant. VRP at 29.

C.V. maintained that there had never been any domestic violence issues in his relationship with H.S. He noted that, on one occasion, someone had called the police because he and H.S. were arguing, even though nothing violent had occurred. When police arrived, there were no physical marks on H.S., and although he was taken into custody, he was released the next day.

C.V. characterized H.S. as excited when she discovered she was pregnant. H.S. visited him frequently while he was in prison and, after R.V. was born, H.S. and R.V. also had video visits with him, including on the day R.V. was born. H.S. even worked on paperwork to bring R.V. for

7

No. 55303-1-II

a visit, although she never actually did. H.S. sent him letters and pictures of herself and R.V. C.V. also financially supported H.S. and R.V. Additionally, he signed an affidavit of paternity for R.V. that H.S. had sent to him, although H.S. never filed it.

At some point, H.S. met someone else and her communication with C.V. waned. C.V. said about that time, he saw picture from H.S.'s social media of R.V. holding a beer. C.V. got upset with H.S. and sent her a text saying he knew where her boyfriend was, but he denied being angry or threatening.

During cross examination, C.V. was confronted with letters in which he seemed to be apologizing to H.S. for "put[ting] hands" on H.S., but he denied writing any of them. VRP at 43-45, 81. C.V. did admit that in his letters to H.S., he often said he was going to get out of prison soon, despite the fact that he was serving a ten year sentence. He made statements in like, "And remember that sooner than later I will come home." VRP at 87. However, C.V. maintained that these statements were not intended to be threatening.

C.V. also admitted to writing letters to H.S. saying things like he hoped she would not run from him again when he got out of prison. But he said these letters were referring to times H.S. would "play games" with him. VRP at 89. He claimed that he was talking about the times H.S. would leave because she was supposedly upset at him and forced him to chase her but, like a game, she would always come back. He maintained that statements like, "Now you are a part of me forever, and now you [can] run but you can't hide. Now I have you forever, baby. Baby, I'm coming home soon," and "[I]f you are not for me, you are for nobody" were expressions of love and affection. VRP at 93-94. He also admitted to sending another letter to H.S. after she had apparently broke up with him saying, "Be Careful. That how you want to do it," and "[R]emember

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55303-1-II

I said that if you are not for me, you are not for no one. I'll give my word on that." VRP at 96-98. He stated that the letter was simply an attempt to persuade H.S. to be with him and let him see R.V. C.V. provided similar explanations for other similar letters.

C.V. denied owning or possessing a gun. When confronted with photos showing C.V. and his children pointing guns at the camera, he maintained that the guns in the pictures were merely BB guns.

2. Additional Testimony

C.V. also presented testimony from five different friends and family members who stated that they never observed abuse in C.V. and H.S.'s relationship. However, only one of these witnesses, Godinez, had spent a significant amount of time with C.V. and H.S.

Godinez testified that although she was upset when C.V. and H.S. became romantically involved, she never saw any injuries on H.S. and never saw C.V. behave abusively toward H.S. Godinez said that H.S. had a vehicle at her disposal to come and go from C.V.'s home. She also stated that she had seen texts between the two of them talking about trying to have a child together.

IV. TRIAL COURT'S DECISION

At the conclusion of the fact finding hearing, the trial court issued its written decision that the birth of R.V. was a result of sexual assault by C.V. and the child was born within 320 days of the sexual assault.

In its written decision, the trial court noted that interpreting the evidence was difficult because both parties had credibility issues but stated that there was credible evidence that C.V. and H.S.'s relationship was based on domestic violence. The trial court noted that it did not believe that everything occurred exactly as H.S. had testified and there were issues with her credibility.

No. 55303-1-II

In its oral decision, the trial court stated that victims of domestic violence often exhibit behaviors that appear to be irrational.[1] The trial court explicitly acknowledged that domestic violence did not necessarily mean that there was sexual assault, but that it still was convinced that R.V. was conceived as a result of an assault. The trial court also stated that C.V. was not a particularly credible witness and the testimonies of other friends and relatives of C.V. who had not spent significant time with C.V. and H.S. were not persuasive. The trial court acknowledged that the testimony of Godinez was more difficult to reconcile as she had lived with both of them and did not seem to have a motive to provide false testimony. However, ultimately, the trial court was convinced by the testimony and evidence that H.S. presented that her sexual assault allegation was true.

Based on its finding of sexual assault, the trial court determined, under RCW 26.26A.465, that C.V. was not a parent, dismissed him from the action, and entered a final parentage order. The trial court subsequently denied C.V.'s motion for reconsideration.

C.V. appeals.

---

[1] "When findings are incomplete, appellate courts may look to the trial court's oral decision to interpret the judgment." *City of Lakewood v. Pierce County*, 144 Wn.2d 118, 127, 30 P.3d 446 (2001).

No. 55303-1-II

## ANALYSIS

### I. CLEAR, COGENT, & CONVINCING EVIDENCE

A. LEGAL PRINCIPLES

In 2017, the legislature passed a statute precluding the establishment of parentage by a perpetrator of sexual assault. *See* SUBSTITUTE H.B. 1543, 65th Leg., Reg. Sess. (Wash. 2017). The statute was later codified into the Uniform Parentage Act and provides:

> In a proceeding in which a parent alleges that a person committed a sexual assault that resulted in the parent becoming pregnant and subsequently giving birth to a child, the parent may seek to preclude the person from establishing or maintaining the person's parentage of the child.

RCW 26.26A.465(2). "Sexual assault" is defined as "nonconsensual sexual penetration that results in pregnancy." RCW 26.26A.465(1).

When a parent makes an allegation under the statute, a trial court must conduct a fact-finding hearing. RCW 26.26A.465(5). An allegation of sexual assault must be proven by "[c]lear, cogent, and convincing evidence that the person committed sexual assault . . . and the child was born within three hundred twenty days after the sexual assault." RCW 26.26A.465(6).

Clear, cogent, and convincing evidence requires that the ultimate fact at issue be shown to be "highly probable." *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). When clear, cogent in convincing evidence is required, we review a trial court's findings of fact for substantial evidence in light of the "highly probable" test. *Id.* "Substantial evidence is evidence sufficient to persuade a fair-minded rational person." *In re Welfare of A.B.*, 181 Wn. App. 45, 59, 323 P.3d 1062 (2014). Evidence that is sufficient under a preponderance of the evidence burden of proof is not necessarily sufficient under the higher burden of proof of clear, cogent, and

11

No. 55303-1-II

convincing evidence. *Sego*, 82 Wn.2d at 739. Appellate courts do not weigh evidence or make credibility determinations, but we may review the entire record to determine whether the trial court's findings are supported by sufficient evidence. *Id.* at 739-40; *In re Det. of LaBelle*, 107 Wn.2d 196, 219, 728 P.2d 138 (1986).

B. APPLICATION

C.V. argues that the trial court erred in finding that H.S. had shown that R.V. was born as a result of sexual assault by clear, cogent, and convincing evidence. Specifically, C.V. contends that the trial court ignored "credible" evidence showing that R.V. was not the product of sexual assault, H.S. failed to provide testimony about the specific dates of the sexual assault which is required by the statute, and the trial court improperly characterized domestic violence as sexual assault. We disagree.

H.S. presented a significant amount of evidence regarding the assaultive nature of her relationship with C.V. H.S. testified that during the five years she was living with C.V. he was regularly abusive. During the critical time period when R.V. was conceived (just before C.V.'s incarceration), H.S. testified that she was living in C.V's garage, where he repeatedly forced her to have intercourse with him and denied her the ability to leave without his permission. H.S.'s graphic testimony directly supported her allegation that R.V. was conceived through a violent assault.

H.S. also presented numerous threatening letters that, together with the testimonies of her mother, Meyers, and her cousin regarding their interactions with H.S. during and around the time of the sexual assault, corroborated H.S.'s testimony. Viewed as a whole, coupled with the credibility determinations that are within the province of the trial court, sufficient evidence

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55303-1-II

supports the conclusion that H.S.'s relationship with C.V. was one of violence during the time period R.V. was conceived, making her allegations that R.V. was the result of sexual assault highly probable.

C.V. disputes this conclusion with several specific arguments. First, C.V. argues that the trial court ignored, without justification, "credible" evidence showing that R.V. was not the product of sexual assault, including the testimony of Godinez that C.V. never abused H.S. and that H.S. was free to come and go as she wished. However, the trial court did not ignore Godinez's testimony. On the contrary, the trial court explicitly acknowledged this testimony, stating that Godinez's testimony was more difficult to reconcile with its findings and acknowledging that she had no apparent reason to lie. However, in weighing the evidence, the trial court found that the evidence was sufficient to support a finding that sexual assault did occur. C.V. appears to be asking this court to reweigh the evidence or make different credibility findings. Because we do not make credibility determinations, C.V.'s argument fails.

C.V. next argues that H.S. failed to provide testimony about specific dates on which she was sexually assaulted, which he claims is required by the statute. However, the statute does not require proof of a specific instance of sexual assault. Rather, it requires a showing that a sexual assault was committed and that a child was born within 320 days of the sexual assault. RCW 26.26A.465(6). H.S. presented evidence that she was repeatedly sexually assaulted by C.V. during the entire time period in which R.V. was conceived. Although H.S.'s testimony did not pinpoint the specific instance of sexual assault where she became pregnant with R.V., the statute does not require her to do so. Thus, we determine that this argument fails.

13

No. 55303-1-II

Finally, C.V. argues that the trial court improperly characterized domestic violence as sexual assault and that evidence of domestic violence was irrelevant to the "narrow" question of sexual assault. This argument ignores the record as a whole. The trial court commented that domestic violence was present in H.S and C.V.'s relationship, but it also explicitly stated that a finding of domestic violence did not necessarily result in a finding of sexual assault. The trial court's finding that R.V. was a product of a sexual assault was sufficiently supported by her testimony about the repeated sexual assaults she endured during the window of R.V.'s conception, which the trial court found to be sufficiently credible. Therefore, we find that this argument, too, fails.

Looking at the record as a whole, the trial court's determination that R.V. was born as a result of sexual assault was supported by substantial evidence in light of the highly probable test required by the clear, cogent, and convincing standard imposed by RCW 26.26A.465.

## II. CONSTITUTIONALITY OF RCW 26.26A.465

C.V. next argues that RCW 26.26A.465 violates both his substantive due process and equal protection rights because he possesses the fundamental right to parent R.V.[2] We disagree.

As a preliminary matter, C.V. failed to bring his due process and equal protection arguments at the trial court level. Therefore, we may refuse to review this claim of error unless C.V. demonstrates a manifest error affecting a constitutional right. *See* RAP 2.5(a). However, given the significance of the constitutional issues raised by C.V., we are deciding to exercise our

---

[2] Although C.V. appears to raise both federal and state due process and equal protection arguments, because the federal and state rights under these clauses are identical, they are each analyzed as one issue. *See State v. Manussier*, 129 Wn.2d 652, 672, 679-80, 921 P.2d 473 (1996).

No. 55303-1-II

discretion and address them. *See* RAP 2.5(a); *Roberson v. Perez*, 156 Wn.2d 33, 39, 123 P.3d 844 (2005).

A. DUE PROCESS

1. Legal Principles

Under both the state a federal constitutions, no person may be deprived of life, liberty, or property without due process of law. U.S. CONST. amends. V, XIV, § 1; WASH. CONST. art. I, § 3. These provisions protect a parent's fundamental right to parent their child. *Meyer v. Nebraska*, 262 U.S. 390, 399-400, 43 S. Ct. 625, 67 L. Ed. 1042 (1923); *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980).

However, this right is not absolute. *Sumey*, 94 Wn.2d at 762. A statute may limit the fundamental right to parent if it passes *strict scrutiny*, meaning it is narrowly tailored to advance a compelling state interest. *In re Custody of Smith*, 137 Wn.2d 1, 15, 969 P.2d 21 (1998). Under this standard, "the state may interfere only 'if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.' " *Id.* at 17 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 234, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)).

When a due process claim does not involve a fundamental right, the standard of review is *rational basis* review. *In re Det. of Morgan*, 180 Wn.2d 312, 324, 330 P.3d 774 (2014). Rational basis review requires that the challenged law be rationally related to a legitimate government interest. *Id.*

We reviews claims of constitutional error de novo. *Zaitzeff v. City of Seattle*, 17 Wn. App. 2d 1, 7, 484 P.3d 470, *review denied*, 198 Wn.2d 1009 (2021); *Cert. denied*, 142 S. Ct. 1123 (2022).

15

No. 55303-1-II

2. Application

C.V. argues that RCW 26.26A.465 violates his substantive due process rights because the statute infringes on his fundamental right to parent and is not narrowly tailored to achieve a compelling state interest and, thus, fails strict scrutiny.[3] He argues that the statute is not narrowly tailored because it does not require any analysis as to whether his contact with R.V. is in the best interests of the child. C.V. also maintains that no compelling state interest is advanced by preventing him from establishing paternity without findings related to potential harm to R.V. We disagree.

The cornerstone of C.V.'s entire argument is the presumption that his biological role in the conception of R.V. automatically confers upon him the constitutionally protected fundamental right to parent. C.V. is wrong. The fundamental right to parent is not necessarily inherent in the fact of a biological relationship. *Lehr v. Robertson*, 463 U.S. 248, 261, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983). The United States Supreme Court has held that the parent-child relationship merits constitutional protection only in "appropriate cases":

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

---

[3] C.V.'s brief suggests a possible *procedural* due process claim in addition to a *substantive* due process claim. However, C.V. conceded during oral argument that he was not raising a procedural claim, so we limit our consideration to only a substantive claim.

16

No. 55303-1-II

*Id.* at 256, 262 (footnote omitted) (court holds that due process rights of putative father who had never established relationship with his child were not violated by failure to provide notice of adoption proceedings).

Although the Supreme Court and Washington courts have never addressed the precise issue of whether a sexual assault perpetrator has the same rights as other parents, the Seventh Circuit Court of Appeals has interpreted the *Lehr* decision to mean that where a person commits a sexual assault that results in the birth of a child, the person does not acquire a fundamental right to parent that child. *Peña v. Mattox*, 84 F.3d 894, 899-900 (7th Cir. 1996) (Posner, J.).

In *Peña*, the court held that the biological father of a child conceived as a result of statutory rape did not have a constitutionally protected interest in the child and, therefore, could not bring a claim related to the adoption of the child. *Id.* Writing for the court, Judge Posner described the fundamental right of parenthood as not being created solely through biology: "It is not the brute biological fact of parentage, but the existence of an actual or potential relationship that society recognizes as worthy of respect and protection, that activates the constitutional claim." *Id.* at 899. "[N]o court has gone so far as to hold that the mere fact of fatherhood, consequent upon a criminal act [of sexual assault] that our society does take seriously and that is not cemented . . . by association with the child, creates an interest that the Constitution protects in the name of liberty." *Id.* at 900.

While the sexual assault perpetrator may acquire constitutional rights, they are not the rights of parenthood; rather the perpetrator merely acquires "the procedural rights that the Constitution confers on criminal defendants." *See Id.* Furthermore, Judge Posner cautioned that

17

No. 55303-1-II

a perpetrator should not be rewarded for his sexual assault "by receiving parental rights which he may be able to swap for the agreement . . . not to press criminal charges." *Id.*

Other courts have similarly found that perpetrators of sexual assault are not afforded the same constitutional protections that are normally given to parents when, through nonconsensual intercourse, they became biological parents. *See Adoption of Kelsey S., supra*, 1 Cal. 4th 816, 849 n. 14, 823 P.2d 1216 (1992) (deciding that nothing supported finding that father of child resulting from sexual assault committed by father would have due process or equal protection rights with regards to custody or adoption of child); *Shepherd v. Clemens*, 752 A.2d 533, 542 (Del. 2000) (stating, "No court has held that the mere fact of biological fatherhood, that was the result of a conception during a criminal act and that is unaccompanied by a relationship with the child, creates an interest that the United States Constitution protects in the name of liberty."); *Christian Child Placement Serv. of New Mexico Christian Children's Home v. Vestal*, 125 N.M. 426, 430, 962 P.2d 1261 (1998) (holding that person shown to have committed crime of sexual penetration of a minor has not acquired a fundamental right to withhold consent to adoption of a child resulting from the crime).

We agree with Judge Posner and these other authorities and hold that a perpetrator of sexual assault does not, by the mere fact of a biological role, acquire a fundamental right to parent a child resulting from the assault. "[T]he brute biological fact of parentage" does not automatically convey the fundamental right to parent to the sexual assault perpetrator. *Peña*, 84 F.3d at 899. Deeply ingrained in our legal system is the concept that a wrongdoer should not be permitted to profit from his wrong. *Id.* at 900. Rapists will not be rewarded for their crimes simply because they were successful in reproductive mechanics.

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55303-1-II

Consequently, the perpetrator is not afforded the same due process rights of a person who is a parent to a child as a result of consensual sexual intercourse. If the perpetrator acquires no additional constitutional rights merely as a result of their biological relationship to the child, then no heightened constitutional protections are triggered; strict scrutiny review standard would not apply. If strict scrutiny is inapplicable, then the lower rational basis standard applies to RCW 26.26A.465 and the statute will pass constitutional muster so long as it is rationally related to a legitimate government interest.

We hold that RCW 26.26A.465 survives the rational basis review. There is a legitimate government interest in protecting victims of sexual assault and children birthed as a result of sexual assault from the violent perpetrators. *See* 34 U.S.C. § 21302 (stating that allowing rapists to maintain a relationship with the child resulting from their rape can have a traumatic impact on the survivor and the child). In the Rape Survivor Child Custody Act, Congress encouraged states to enact statutes to allow rape survivors "to petition for the termination of parental rights of the rapist." 34 U.S.C. § 21302(7). It found that "[a] rapist pursuing parental or custody rights causes the survivor to have continued interaction with the rapist, which can have traumatic psychological effects on the survivor, and can make it more difficult for her to recover." 34 U.S.C. § 21302(8). "Rapists may use the threat of pursuing custody or parental rights to coerce survivors into not prosecuting rape, or otherwise harass, intimidate, or manipulate them." 34 U.S.C. § 21302(10). "These traumatic effects on the mother can severely negatively impact her ability to raise a healthy child." 34 U.S.C. § 21302(9).

Although the perpetrator may also have some interest in maintaining the relationship with the child, that interest is outweighed by the fact that the child was a result of their violent act and

19

No. 55303-1-II

outweighed by the strong interest in protecting the victim parent from the trauma of having to continue to interact with the perpetrator. For these reasons, protection of victims of sexual violence from further harm and the consequent effect on the raising of a child is a legitimate government interest.

The statute also is rationally related to the government's interest here for at least two reasons. First, the statute is limited to circumstances where the person has not already been adjudicated to be the parent of the child and where an allegation of sexual assault is made within four years of the child's birth. By preventing a trial court from terminating the parentage of a person who may have already established a parent-child relationship with the child, these requirements limit the statute's reach to those individuals whose involvement with the child has not developed beyond a biological role and, thereby, mitigate against damaging the child's interest in maintaining an existing parental bond.

Second, the statute requires proof by clear, cogent, and convincing evidence prior to the termination of parental rights. This high standard has been determined by the Supreme Court as satisfying due process even in the context of termination of rights of parents who possess additional constitutional rights to parent (which sexual assault perpetrators do not). *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). In *Santosky,* the court determined that when terminating the constitutional right to parent, striking a fair balance between the rights of parents and the State's interests required more than simply a preponderance of the evidence. *Id.* at 769-70. By using this same high evidentiary standard, RCW 26.26A.465 then clearly exceeds the standard necessary to meet the rational basis review.

No. 55303-1-II

Because RCW 26.26A.465 is rationally related to a legitimate government interest, it satisfies rational basis review and does not violate C.V.'s substantive due process rights.

B. EQUAL PROTECTION

C.V. next contends that RCW 26.26A.465 violates equal protection because the statute treats him differently than other established parents.

1. Legal Principles

Under the Fourteenth Amendment of the Constitution and article I, section 12 of the Washington Constitution, equal protection provides that similarly situated persons are entitled to be treated similarly under the law. *State v. Coria*, 120 Wn.2d 156, 169, 839 P.2d 890 (1992).

An equal protection analysis requires us to first determine whether the person making the claim is similarly situated with other individuals. *State v. Osman*, 157 Wn.2d 474, 484, 139 P.3d 334 (2006). "A defendant must establish that he received disparate treatment because of membership in a class of similarly situated individuals and that the disparate treatment was the result of intentional and purposeful discrimination." *Id.* "Although equal protection does not require that the State treat all persons identically, any classification must be relevant to the purpose for the disparate treatment." *Id.*

If we determine that a statute treats similarly situated individuals differently, we then evaluate the statute under an equal protection analysis. To determine whether a statute violates equal protection, we will either apply strict scrutiny, intermediate scrutiny, or rational basis review. *State v. Hirschfelder*, 170 Wn.2d 536, 550, 242 P.3d 876 (2010). Which test applies depends on the classification and rights involved:

21

No. 55303-1-II

> Suspect classifications, such as race, alienage, and national origin, are subject to strict scrutiny. 'Strict scrutiny also applies to laws burdening fundamental rights or liberties." Intermediate scrutiny applies only if the statute implicates both an important right and a semi-suspect class not accountable for its status. Absent a fundamental right or suspect class, or an important right or semi-suspect class, a law will receive rational basis review.

*Id.* (internal quotation marks and citations omitted).

2. Application

Similar to his arguments about due process, C.V. argues that RCW 26.26A.465 violates his equal protection rights. He claims that the law unfairly applies different standards to two groups of parents—parents who are accused of sexual assault resulting in the birth of a child and other parents facing termination of their parental rights. He argues that equal protection is violated because RCW 13.34.180 of the dependency statute and RCW 26.33.120 of the adoption statute both require failures by a parent in undertaking their duties and consideration of the best interests of the child, while RCW 26.26A.465 does not.[4] We disagree.

C.V.'s equal protection argument requires these two groups of parents to be similarly situated, but they are not. The parent classes to which C.V. refers involve individuals who possess the fundamental right to parent. RCW 13.34.180 provides for the termination of the rights of an *established* parent in the context of a dependency. RCW 26.33.120 provides for the termination of the rights of an *established* parent in the context of a potential adoption. Unlike the parents covered in these statutes, C.V. does not have an established fundamental right to parent R.V. As

---

[4] C.V. also argues, solely in his reply brief, that the statute violates equal protection because it discriminates on the basis of gender. Because he fails to raise this issue in his opening brief, we decline to address it. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration.").

No. 55303-1-II

explained above, perpetrators of sexual violence who become biological parents as a result of an assault do not obtain the same rights of other parents. Rapists are simply not similarly situated with any other class of parents. Without a similarly situated class, C.V.'s equal protection argument fails.

This conclusion comports with holdings from other courts. While Washington courts have not addressed this precise issue, the Supreme Court has held that where one parent has a substantial relationship with a child and the other does not, the parents are not similarly situated for the purpose of implicating equal protection. *Lehr*, 436 U.S. at 265-67.

Similarly the New Mexico Supreme Court has held that "individuals who commit rape or incest of a child, thereby fathering a child, are not similarly situated to a parent who lawfully fathers a child and is subsequently charged with neglect." *Vestal*, 125 N.M. at 432. When the respondent in *Vestal*, who was a biological parent as a result of sexual penetration of a thirteen-year-old child, equated his case to that of an unwed father seeking to exercise parental rights over a child born out of wedlock, the court disagreed:

> An individual who has committed criminal sexual penetration of a child, thereby impregnating her, may be an unwed father, but he is not similarly situated to an unmarried man who has fathered a child by a consenting adult women.

*Id.* at 431-432.

We agree with these authorities. Accordingly, because C.V. fails to identify another similarly situated class, his equal protection argument fails.

No. 55303-1-II

CONCLUSION

In conclusion, we hold that there was sufficient evidence to support the trial court's conclusion that R.V. was conceived as a result of sexual assault as required under RCW 26.26A.465. Further, we hold that as a perpetrator of sexual assault that resulted in the birth of a child, C.V. does not have a fundamental right to parent R.V. Without implicating a fundamental right, C.V.'s substantive due process claim is reviewed under a rational basis standard, and RCW 26.26A.465 withstands such review. Finally, we hold that C.V.'s equal protection claim fails. Accordingly, we affirm the superior court.

PRICE, J.

I concur:

J., J.

24

No. 55303-1-II

GLASGOW, C.J. (concurring)—I agree with the majority that the trial court's ruling was supported by substantial evidence and that CV is not similarly situated to established parents facing termination proceedings for purposes of an equal protection analysis. I also agree with the majority that CV has not acquired a fundamental right to parent and that RCW 26.26A.465 satisfies rational basis review. I write separately to emphasize that even if a fundamental right to parent were implicated, RCW 26.26A.465 would nevertheless survive a strict scrutiny analysis.

CV contends RCW 26.26A.465 violates substantive due process because it "does not identify any compelling State interest that is being advanced by preventing paternity from being established without any analysis as to potential detriment of the child." Opening Br. of Appellant at 27. I disagree.

When reviewing a constitutional challenge to a statute, we presume the statute is constitutional. *Wash. Bankers Ass'n v. State*, 198 Wn.2d 418, 427, 495 P.3d 808 (2021), *pet. for cert. filed*, No. 21-1066 (2022). We "must begin 'with the assumption that the legislature, which is a coequal branch of government that is sworn to uphold the Constitution, has indeed considered the constitutionality of its enactments.'" *In re Dependency of I.J.S.*, 128 Wn. App. 108, 115, 114 P.3d 1215 (2005) (quoting *In re Custody of Osborne*, 119 Wn. App. 133, 147, 79 P.3d 465 (2003)).

"A parent's constitutionally protected right to rear [their] children without state interference, has been recognized as a fundamental 'liberty' interest protected by the Fourteenth Amendment and also as a fundamental right derived from the privacy rights inherent in the constitution." *In re Custody of Smith*, 137 Wn.2d 1, 15, 969 P.2d 21 (1998). But a parent's rights "'are not absolute and must yield to fundamental rights of the child or important interests of the State.'" *In re Custody of Shields*, 157 Wn.2d 126, 142, 136 P.3d 117 (2006) (internal quotation

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55303-1-II

marks omitted) (quoting *In re Marriage of Allen*, 28 Wn. App. 637, 646, 626 P.2d 16 (1981)). The State may interfere with the right to parent if it "'can show that it has a compelling interest and such interference is narrowly drawn to meet only the compelling state interest involved.'" *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57, 109 P.3d 405 (2005) (quoting *Smith*, 137 Wn.2d at 15).

When the legislature enacted RCW 26.26A.465, it intended to protect both survivors of sexual assault and their children. The legislature first offered parent survivors of sexual assault a process for precluding the person who assaulted them from establishing legal parentage in 2017. *See* SUBSTITUTE H.B. 1543, 65th Leg., Reg. Sess. (Wash. 2017). At that time, in addition to adopting the section now codified at RCW 26.26A.465 in Washington's Uniform Parentage Act, chapter 26.26A RCW, the legislature simultaneously amended RCW 26.09.191, the statute governing parenting plans and residential time. The legislature amended RCW 26.09.191 to add, "The court shall not enter an order . . . allowing a parent to have contact with a child if the parent has been found by clear and convincing evidence pursuant to RCW 26.26A.465 to have committed sexual assault . . . against the child's parent" and "the child was born within three hundred twenty days of the sexual assault." RCW 26.09.191(2)(m)(iii); *see* LAWS OF 2017, ch. 234, § 2.

There can be no dispute that the legislature may place limits on the rights and responsibilities that accompany parentage based on a compelling state interest. *See, e.g.*, *In re Custody of L.M.S.*, 187 Wn.2d 567, 571, 387 P.3d 707 (2017) (explaining that a former statute allowed a nonparent to petition for child custody where there was a threshold showing that "the biological parent is either unfit or that placing the child in the parent's custody would result in actual detriment to the child's growth and development"). Sexual assault is a "crime serious enough to call into question[] a person's capacity to parent." Anastasia Doherty, *Choosing to Raise*

26

No. 55303-1-II

*a Child Conceived Through Rape: The Double-Injustice of Uneven State Protection*, 39 WOMEN'S RTS. L. REP. 220, 267 (Spring/Summer 2018).

The State has a well-established compelling interest in the safety and welfare of children. "As parens patriae the state acts from the viewpoint and in the interests of the child . . . where a child has been harmed or where there is a threat of harm to a child." *Smith*, 137 Wn.2d at 16. If a parent's actions "seriously conflict with the physical or mental health of the child," the State is not merely permitted to intervene, but has a "*responsibility* to intervene to protect the child." *Id.* at 25; *see also In re Welfare of A.W.*, 182 Wn.2d 689, 709, 344 P.3d 1186 (2015) ("The State's primary interest is providing for the health and safety of children.").

There is also a compelling state interest in protecting survivors of sexual assault from further contact with and harm by the perpetrator of the assault. *See State v. Lee*, 188 Wn.2d 473, 496, 396 P.3d 316 (2017) ("[T]he State has a compelling interest in protecting rape victims."); *State v. Phillips*, 6 Wn. App. 2d 651, 676, 431 P.3d 1056 (2018) ("The State has a compelling interest in preventing future harm to the victims of [domestic violence assault] and in protecting children."); *In re Pers. Restraint of Martinez*, 2 Wn. App. 2d 904, 915, 413 P.3d 1043 (2018) ("[T]he State has a compelling interest in preventing contact between a [convicted child rapist] and victim where the [rapist] continues to pose a threat to the victim."), *abrogated on other grounds by In re Pers. Restraint of Winton*, 196 Wn.2d 270, 474 P.3d 532 (2020). Where a pregnant survivor faces the possibility of parenting the resulting child with their rapist, the State has a compelling interest in protecting against possible manipulation of the survivor, not to mention the harm in being forced to subject their child to their own attacker. Testimony in favor of the 2017 legislation acknowledged that the threat of a custody battle can be used to coerce a

No. 55303-1-II

sexual assault survivor to refuse to cooperate in a criminal prosecution. S.B. REP. ON SUBSTITUTE H.B. 1543, at 4, 65th Leg., Reg. Sess. (Wash. 2017). The testimony also emphasized the harm that occurs when a survivor is forced to litigate a parenting issue with their rapist or permit the person who assaulted them to have access to their child. *Id.* at 5.

Perhaps recognizing the compelling state interests at stake, CV focuses on the "narrowly tailored" requirement in the strict scrutiny analysis. CV cites RCW 26.09.191(2)(a)(iii) as an example of the legislature's ability to provide less restrictive means "to address any perceived risk to the child." Opening Br. of Appellant at 27. RCW 26.09.191(2)(a)(iii) requires limiting a parent's residential time where the parent has been found to have committed "sexual assault that causes grievous bodily harm or the fear of such harm or that results in a pregnancy." RCW 26.09.191 also includes rebuttable presumptions that a person convicted of certain sex offenses, including indecent liberties, "poses a present danger to a child" and "places a child at risk of abuse or harm." RCW 26.09.191(2)(d), (e). CV argues that the Uniform Parentage Act's conclusive presumption could be more narrowly tailored to align with the rebuttable presumptions in RCW 26.09.191. But the legislature has clarified that these presumptions "may be rebutted only after a written finding that the child was *not* conceived and subsequently born as a result of a sexual assault committed by the parent requesting residential time." RCW 26.09.191(2)(f), (g) (emphasis added). In other words, if the child was conceived as a result of sexual assault, the legislature has assumed the assaultive parent will inherently pose a danger or risk of harm to that child. Thus, the legislature expressly rejected the possibility of providing greater flexibility or allowing fewer restrictions under the circumstances at issue here. In sum, these statutes do not support CV's assertion that more narrow tailoring has occurred under chapter 26.09 RCW.

No. 55303-1-II

The Washington Legislature has chosen to be on the forefront of protection for rape survivors and their children, and there is support for our legislature's judgment that permitting a person who committed sexual assault to gain *any* parental rights to a resulting child would be harmful for that child. As noted by the majority, the United States Congress has recognized that allowing a person who committed sexual assault resulting in a child to pursue parental rights "can have traumatic psychological effects on the survivor," which, in turn, "can severely negatively impact [the survivor's] ability to raise a healthy child." 34 U.S.C. § 21302(8)-(9); *see* majority at 19. Accordingly, Congress found, "Men who father children through rape should be prohibited from visiting or having custody of those children." 34 U.S.C. § 21302(1).

Concern with the "'domino effect'" of allowing those who have perpetrated sexual assault resulting in pregnancy to assert parental rights, which harms the mother's ability to parent and subsequently harms the child, is echoed in numerous scholarly articles. Rachael Kessler, Note and Comment, *Due Process and Legislation Designed to Restrict the Rights of Rapist Fathers*, 10 NW J.L. & SOC. POL'Y 199, 210 (Spring 2015); *see also* Jordan S. Miceli, Note, *The Haunting of Her House: How Virginia Law Punishes Women Who Become Mothers Through Rape*, 78 WASH. & LEE L. REV. ONLINE 129, 157 (2021) ("[I]f the mother is forced into a legal relationship with her rapist, her mental health may deteriorate as a result of his continual presence in her life. This mental deterioration may affect her parenting and cause the child to suffer." (footnote omitted)); Margot E. H. Stevens, Note, *Rape-Related Pregnancies: The Need to Create Stronger Protections for the Victim-Mother and Child*, 65 HASTINGS L.J. 865, 877 (April 2014) (acknowledging that "[t]he circumstances of conception . . . can largely influence the stability of the home and development of the child" and that "exposure to domestic violence, which can include sexual assault . . . has

29

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55303-1-II

been shown to cause adverse behavioral and psychological effects in children"). The Washington Supreme Court Gender and Justice Commission has also recognized studies showing that individuals who perpetrate sexual assault often commit other acts of interpersonal violence, sometimes including physical or sexual abuse of a child. WASH. SUP. CT. GENDER & JUSTICE COMM'N, SEXUAL VIOLENCE BENCH GUIDE FOR JUDICIAL OFFICERS 1-1 to 1-14 (Mar. 2019, rev. 2018). Thus, there is ample support for a compelling state interest in avoiding the risk of these harms to survivors of rape and their children. CV does not credibly undermine the legislature's conclusion that if RCW 26.26A.465 were to provide for *any* legal relationship or contact by the assaultive parent, the risk of concrete harm to the survivor-parent and their child would be too great.

RCW 26.26A.465 is also narrowly tailored because it applies only where parental rights have not previously been established. As the majority recognizes, RCW 26.26A.465 is intended to preclude the establishment of parental rights for "those individuals whose involvement with the child has not developed beyond a biological role." Majority at 20. It applies where there has been no prior adjudication of parentage and the child is younger than four years old. RCW 26.26A.465(3), (4). The statute does not seek to sever established familial relationships.

CV points out that statutes allowing for termination of parental rights are typically "'narrowly drawn because the State must prove that the relationship with the parents harms or potentially harms the child before the court can terminate parental rights.'" Opening Br. of Appellant at 27 (quoting *I.J.S.*, 128 Wn. App. at 118). But because RCW 26.26A.465 is so narrow in the scope of its application, it need not require an individualized inquiry into the potential harm of each relationship. There is no need for a trial court to weigh or consider the possible harm to a

30

No. 55303-1-II

child of depriving them of a relationship with a sexually assaulting parent where that relationship does not yet exist. *Cf. Smith*, 137 Wn.2d at 21 (observing that where a child does not have a "substantial relationship" with a person, harm to the child "cannot reasonably be anticipated as a result of no contact" with that person).

In some cases, foreclosing the possibility of a child ever knowing their biological parent may be a loss that "cannot be measured." *Santosky v. Kramer*, 455 U.S. 745, 760 n.11, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). However, it is important to remember that this statute does not simply deprive a child of the theoretical benefit of developing a relationship with one biological parent; it provides the child with the concrete benefit of a fit biological parent whose well-being as a survivor of sexual assault is protected and whose capacity to parent to the best of their abilities is preserved. Moreover, this fit biological parent already has an established relationship with the child.

When courts disregard how exposure to violence, whether direct or indirect, affects children, they "continue to justify presumptions of parental equality, resulting in custody awards that approximate the nuclear family, resistance to terminating the parental rights of [parents] who are violent, and adherence to the two-parent paradigm." Judith Lewis, *The Stability Paradox: The Two-Parent Paradigm and the Perpetuation of Violence Against Women in Termination of Parental Rights and Custody Cases*, 27 MICH. J. GENDER & L. 311, 346 (2020). "[T]his deliberate judicial failure to recognize the harm to children justifies creating less stable family units, perpetuating violence." *Id.* In an effort to protect sexual assault survivors *and* their children from further violence, the legislature reasonably rejected the outdated inclination to prioritize the nuclear family structure and presume a biological father's involvement may be beneficial to a

31

No. 55303-1-II

child, regardless of the father's proved sexual assault against the parent who gave birth to the child. This is consistent with the State's parens patriae interest.

And RCW 26.26A.465 only applies to preclude the establishment of parentage where the parent who gave birth to the child submits a petition requesting that the perpetrator be precluded from playing a role in the child's life, the trial court finds that the child was conceived as a result of the perpetrator's sexual assault by at least clear and convincing evidence, the child is still young, and the perpetrator's parentage has not previously been established. Thus, the statute is narrowly tailored to address a specific harm under specific circumstances. Accordingly, I would hold that RCW 26.26A.465 would survive a strict scrutiny analysis.

Because I would hold RCW 26.26A.465 constitutional under either a rational basis or strict scrutiny standard of review, I concur.

_____
Glasgow, C.J.

32